## THE CLARA GOODWIN.

### THE CLELIA BASSO.

(District Court, E. D. Virginia. January 16, 1906.)

COLLISION—VESSELS LYING AT ANCHOR—DRAGGING OF ANCHOR.

> Evidence considered, and *held* to establish, by a preponderance of proof, that a collision which occurred between a barkentine and a schooner while lying at anchor in the night during a high wind and strong tide was caused by the dragging of the barkentine's anchor, there being a direct conflict of evidence, but the testimony of two disinterested and intelligent witnesses from other vessels lying nearby concurring that the barkentine had changed her position of anchorage during the night, and also testimony that, when her anchors were raised in the morning to change her position, one was found to be fouled by the chain and in such condition that it would not hold.

In Admiralty. Suit and cross-libel for collision.

Lewis & Laws, Foster & Foster, and W. L. Williams, for the Clelia Basso.

Hughes & Little, for the Clara Goodwin.

WADDILL, District Judge. On the evening of the 3d day of March, 1904, about 8:30 o'clock, the barkentine Clelia Basso, of 324 tons net register, and the four-masted schooner Clara Goodwin, of 846 tons net register, were at anchor in the Delaware Breakwater, a harbor of refuge on the Atlantic coast, and while thus anchored came into collision, by reason of the anchor of one or the other of the vessels dragging during the storm. The wind at the time was blowing strongly from the northwest, at an increasing velocity during the preceding two hours from about 28 to 45 miles an hour; the tide

running strongly from the southeast. The contentions of the respective vessels are that one was "windrode" and the other "tiderode." The barkentine, with her square-rigged mast, which at the time only drew 9 feet of water, was driven by the wind against the tide, and the schooner, drawing 18 feet of water, was swept by the tide against the wind, whereby the two vessels were driven in opposite directions into collision one with the other.

No question of law is presented for the consideration of the court—the case turning entirely upon the correct determination of the fact as to how the two vessels, anchored as they were, managed to collide under the existing conditions of wind and tide, and which vessel in point of fact dragged its anchor; it being conceded that there would have been no collision but for one or other of the vessels dragging her anchor. The crew of the barkentine and her managing owner, who was on board, were examined, and the captain, mate, and four of the crew of the schooner, and the barkentine also introduced several expert witnesses, who testified as to the impossibility of the collision occurring by reason of the dragging of the anchor of the barkentine. The owner of the schooner examined two other witnesses, one a pilot and second officer of the cruiser Denver, then lying at anchor in the harbor on her trial trip, and the other a pilot from a Delaware river pilot boat, then lying in the harbor out of the weather; the cruiser being immediately in the vicinity of the point of collision, and the pilot boat only a short distance away.

The difficulty of determining just how these two vessels, in the darkness of the night and the prevailing storm, actually came together, is manifest. In fact, it is a matter more or less problematical to determine precisely how any accident actually happened; and, when dealing with one which occurred under the conditions here, it is unusually so. It is frequently next to impossible to determine just how any given accident could occur under the apparent conditions surrounding it; and it is a question upon, and a subject as to which, the average expert delights to theorize. The court was somewhat puzzled to determine how the vessels got together as they did, and was to some extent impressed with the evidence of the experts in this case, who were gentlemen of intelligence and standing, as it was with the evidence of the barkentine's crew, taken a short time after the collision; and while the court had not the advantage of seeing them, as it did the officers and some of the crew of the schooner, it was also impressed with their statements. The officers and crew of each vessel, however, were equally positive that the collision occurred solely from the anchor of the opposing vessel dragging, and the court has to decide this case either upon the theory of the experts, who seek to demonstrate that the collision could not have happened by the barkentine's anchor dragging, or the evidence of witnesses not interested in either vessel, who testified that it did so happen. The witness from the government cruiser testified that he was within 300 yards of the scene of the collision, and he heard the outcry, saw the two vessels when they came together by their lights, and that the schooner had not changed her position from where it

was anchored, while the barkentine had and drifted into the schooner, changing her location some 200 yards. He also testified that the morning after the collision the barkentine had changed her location, placing herself in much closer proximity to the schooner than theretofore, and at a point between his ship and the schooner, whereas she had been on the opposite side previously. The witness from the pilot boat also thoroughly sustains this view, and they both positively testify that the collision occurred by reason of the dragging of the anchor of the barkentine, and that the schooner did not change her place of anchorage. The witness from the pilot boat further testified that on the morning after the collision he took the barkentine further in shore, and that upon raising her starboard anchor he observed that the same was fouled by reason of the anchor chain having become entangled with the fluke of the anchor, and that the barkentine was anchored by the pilot boat with her port anchor. These two witnesses from the government ship and the pilot boat were men familiar with the matters about which they were testifying, and they appeared to be intelligent, and apparently without interest in the controversy, and testified fully and positively as to the circumstances; and the court cannot see its way clear to disregard their version of the collision, and which appears reasonable within itself, particularly when coupled with the fouled condition of the anchor. They were each a member of crews of vessels then lying at anchor in the harbor, and necessarily surrounded by persons who might have given a different account of the transaction, if their statements were not true. They were examined more than a year before this trial, and no step was taken either to contradict them or to show through others in a like position to see and know a different state of facts, and their account of the collision should be accepted. The captain of the schooner and one of his crew testified that about 12 o'clock on the day after the collision, after the pilot boat had moved the barkentine, they had reason to go ashore, and in passing the barkentine observed her starboard anchor hanging in the hawsepipe in the fouled condition above described, and the captain further testified that the anchor in this fouled condition would not have held the barkentine.

With this positive evidence of the fact that the barkentine did change her place of anchorage, and of the condition in which her anchor was found, the conclusion reached by the court is that the fault of the collision should be attributed to the barkentine, and not to the schooner; and a decree may be so entered.