## THE CIUDAD DE REUS.

### THE MARAVAL.

(Circuit Court of Appeals, Second Circuit. February 14, 1911.)

#### Nos. 136, 137.

COLLISION (§ 72*)—ANCHORED VESSELS — DRAGGING OF ANCHOR — NEGLIGENT LOOKOUT.

    A collision between the steamships Ciudad de Reus and Maraval, while both were anchored at night in Upper New York Bay opposite Stapleton, *held*, on conflicting evidence, due to the fault of both vessels; the Reus being initially in fault for permitting her anchor to drag under the influence of the wind, which was not extraordinary, and both for not keeping a proper lookout, which would have enabled either to avoid the collision, whereas neither lookout observed that the vessels were approaching each other until at the time of or immediately before the collision.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 102; Dec. Dig. § 72.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Trinidad Shipping & Trading Company, Limited, as owner of the steamship Maraval, against the steamship Ciudad de Reus, and cross-libel by La Mutua Sociedad Anonima as owner of the Reus, against the Maraval. Decree against the Maraval (171 Fed. 470), and claimant appeals. Reversed, with directions.

Convers & Kirlin (J. Parker Kirlin and William H. McGrann, of counsel), for appellant.

Curtis, Mallet-Prevost & Colt (A. H. Strickland, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WARD, Circuit Judge. These are cross-appeals. The cause is upon a libel and cross-libel filed by the owners of the steamers Ciudad de Reus and Maraval respectively, which were lying at anchor somewhere opposite Stapleton and came into collision in the early morning of January 5, 1908. The Reus had been lying safely at her anchorage through several tides since the morning of January 3d. On January 5th at 1:50 a. m. the Maraval dropped her anchor and brought up on it within a few minutes afterwards. Subsequently the starboard side of the Reus amidships came into contact with the bluff of the port bow of the Maraval; each vessel sustaining considerable injury. The Reus then swung around and lay alongside with her starboard bow about amidships and projecting half her length aft of the Maraval. In this position the vessels lay for hours. At daylight the Maraval found it impossible to raise her anchor until the Reus slipped her chain, and then the Maraval brought up both anchors foul of each other. The anchor of each vessel was adequate.

The time of the collision is disputed; the single watchman on the deck of the Reus saying first it was half an hour and afterwards 22 to 24 minutes, and the quartermaster on the deck of the Maraval saying that it occurred about 10 minutes, after the Maraval anchored. We think this a mistake. The weight of the testimony, confirmed by the scrap log of the Maraval's engine room, is clearly that it occurred about 45 minutes afterwards.

The pleadings of the Reus are on the theory that the Maraval anchored too near her, making a foul berth, and then swinging around under the force of the ebb tide to the southwest struck the Reus amidships with her bow.

The pleadings of the Maraval, on the other hand, are on the theory that she anchored to the south and east of the Reus in a safe berth which vessel under the force of the northwest wind dragged her anchor in a southeasterly direction and so came foul of the Maraval.

It is agreed upon both sides that the wind was blowing from the northwest. The United States Weather Record taken on the roof of 100 Broadway shows an hourly wind movement between 12 and 1 a. m. of 17 miles west and between 1 and 2 a. m. of 24 miles northwest with no squalls, at least which lasted five minutes; no maximum velocities (i. e., over 29 miles) of less duration being ever included in such reports. It seems to us quite impossible that such a wind as is described in the report could have caused either vessel to drag her anchor.

Low water occurred at Sandy Hook at 2:15 a. m., but the current continued to run down for more than two hours after that period; its average strength being 1.5 knots an hour. See Judge Addison Brown's interesting note to the case of the Ludwig Holberg (D. C.) 36 Fed. 917. We cannot believe that such a current would cause either vessel to drag her anchor.

There is no accurate testimony as to the set of the ebb current, nor do we know of any record of it in the Upper Bay. Observations have been published of the set of the current in the Lower Bay in connection with the work on Ambrose Channel. The report of the Metropolitan Sewerage Commission dated April 30, 1910, contains a record of interesting experiments with floats, but not helpful on this point.

Robinson, master of one of the New York & Cuba steamers, says the ebb has a S. S. W. tendency opposite Stapleton and then favors the beach to the Narrows, and Second Officer Kuhlman and Chief Officer Smith of the Maraval testify similarly. Many other witnesses say it runs north and south. The District Judge found the current to be S. W. The configuration of the river and bay seems to indicate that the ebb tide would naturally set towards the Staten Island shore; but we cannot believe it sets so far west as southwest.

We lay out of consideration the contention of the Reus that the Maraval dropped her anchor on or near the anchor of the Reus and then swung around to the S. W. by the force of the tide against the Reus. It is in the highest degree improbable that any pilot would anchor so close to another vessel, or, if he did, that the watch on the Reus would not have appreciated the danger and immediately have called up an officer. Putting the Maraval when she brought up on her anchor 60 fathoms off the starboard side of the Reus, as the watchman on the Reus testified, the Maraval, if controlled by an ebb current of 1.5 knots, would have swung into collision with the Reus in about two minutes, and the pilot, officers, and whole watch of the Maraval would have been witnesses of it, and the second officer of the Royal Prince could hardly have failed to see it. Moreover, she would have swung alongside, and, being 324 feet long, would have projected less one-half the length of the Reus, viz., nearly 200 feet astern of her, which she did not do.

Both parties agree that the Maraval anchored east of the Reus, and the real dispute is whether to the north and east or to the south and east, and whether she, under the force of the ebb tide, dragged S. W., or the Reus, under the force of the N. W. wind, dragged S. E.

The District Judge very truly stated that the testimony creates a situation of inextricable confusion. He did not attempt to reconcile the testimony of the many witnesses and the diagrams they made and the points they marked on the charts as to the original anchorage of the vessels and their location afterwards at different times on the same day. We shall follow his example in this respect. He apparently found that the Maraval anchored N. and E. of the Reus, relying principally upon the testimony of Foster, first officer, and Ramsay, second officer, of the Royal Prince, which lay at anchor some distance lower down the bay. He attached importance to their depositions because they were disinterested witnesses, and because, though examined on behalf of the Maraval, their depositions were offered in evidence by the Reus. Foster's watch was from 4 to 8 a. m., and we discover nothing significant in his deposition. Ramsay's watch was from 12 to 4 a. m., and, though his testimony is not very positive and does not indicate accurate observation, it favors the Reus as far as it goes. He says:

"When you went on watch at 12 o'clock, did you see any vessels anchored above you? A. Yes, sir; there was one vessel ahead of us.

"Q. How far ahead do you think she was? A. About a mile.

"Q. Was she towards the Staten Island shore? A. She was closer in.

"Q. Could you see any other vessel anchored near there at 12 o'clock? A. No, sir.

"Q. At any time from 12 to 4 did you see more than one vessel anchored above you within a mile? A. No, sir.

"Q. Did you see any vessel come in between the hours of 12 and 4 and go by you. A. Yes, sir; there was one vessel passed very close to us.

"Q. Do you know what vessel she was? A. No, sir; I couldn't see. It was dark.

"Q. Do you know where she anchored? A. No, sir; I couldn't say

"Q. Have you any idea? A. No, sir.

"Q. Do you know whether that vessel anchored above or below the vessel that you saw anchored about a mile above you? A. It must have been above.

"Q. That is to say, you think that the vessel that went by you between 12 and 4 anchored above the vessel you said you saw anchored within a mile at 12 o'clock? A. Yes, sir.

"Q. Can you state approximately what time that vessel came in? A. Yes, sir; it was between half past 12 and quarter to 1; between 12:30 and 12:45.

"Q. Suppose that the vessel that you saw pass you at a quarter to 1 or half past 12, anchored above the vessel which you have just described you saw at 12 o'clock in collision; in your opinion would the vessel which passed you in the neighborhood of 1 o'clock be the vessel which dragged her anchor? A. I couldn't say I am sure; I didn't see the ship, it being so dark that I couldn't see anything about it; I just saw the lights.

"Q. Suppose a vessel were anchored above you a mile, and another vessel a mile and a quarter, and suppose you saw these vessels together after that. Considering the conditions of the wind and the tide, which of those vessels in your opinion dragged her anchor? A. The one to the northward.

"Q. That would be the vessel which you saw go by you between half past 12 and half past 1? A. Probably it would be that one; yes, sir.

*    *    *    *    *    *    *    *    *    *    *    *

"Q. You are sure that that vessel anchored above the vessel which you said at 12 o'clock you saw about a mile above you? A. Yes, sir; she did not anchor between us and the other one."

The positions the vessels would take when brought up to their anchors would be the resultant of the force and directions of the wind and tide. The Reus is an oil tanker with her boilers and engines far aft and was on this occasion light, drawing 12 feet forward and 18 feet aft. The Maraval, on the other hand, was laden to a draft of 20 feet 6 inches. The Reus would feel the wind more and the tide less than the Maraval, so that the resultant of these forces would be likely to make her head a little more to the N. W. than the Maraval would. The heading would no doubt vary, especially if dragging her anchor.

Against the testimony of the anchor watchman of the Reus and of the second officer of the Royal Prince, as to where the Maraval anchored (which is not consistent), we have that of Scott, master, Kuhlman, second officer (on watch), Esturo, third engineer, on deck, Smith, chief officer, Magras, quartermaster (on watch), and Lennon, pilot. These witnesses say that the Maraval anchored south and east of the Reus in a clear berth, and that the Reus was dragging her anchor when the collision took place. · This could only have been by force of the wind. All the witnesses agree that it was strong with occasional squalls, and it must have been very different from what it was on the top of No. 100 Broadway. A tide of 1.5 or even 2 knots an hour could not, in our judgment, cause either of these vessels to drag her anchor, and there is nothing left to explain what happened but the wind.

·Doubtless the illusion of the transfer of motion from a train in which we sit in a station to the train alongside, which deceives us con-

stantly and against all experience, applies to some extent to persons on vessels as to which is moving in the dark, so that observers on the deck of each vessel, especially who, as in this case, discovered their proximity just as the collision occurred, might easily impute the movement of their own to the other vessel. Still, the weight of the testimony satisfies us that it was the Reus which dragged. The position of the vessels after the collision is more consistent with this theory. If the Maraval, 324 feet long, had dragged into the Reus, 255 feet long, amidships, and then swung around, she would have overlapped the Reus nearly 200 feet; whereas, if the Reus dragged into the bow of the Maraval and swung around she would have dragged on until she brought up on her anchor or on the Maraval's anchor. That she did overlap the Maraval about 100 feet is an indication that this is what happened, made more likely if, as now contended, the Reus had out 60 fathoms of chain as against the Maraval's 45 fathoms.

The collision not being due to inscrutable fault the final question is: Was it inevitable? Plainly not. Both vessels kept a most negligent watch. Neither discovered the dangerous proximity until, in the case of the watch on the Reus, the collision was imminent, and, in the case of the Maraval, until it had actually occurred. The movement of the Reus dragging her anchor must have been slow. She is bound to show that the collision was inevitable. To do so she must exclude all causes due to her own negligence. If the anchor watch had seasonably discovered that she was dragging, it would have been his duty to call the master or an officer on deck. We cannot say that the collision might not have been avoided in that case by ordinary nautical precautions such as paying out more chain, or dropping another anchor. Likewise the Maraval, having steam up, might have altered her position or even have raised her anchor and moved to a safe anchorage, or might have shortened or paid out chain, and so might have enabled the Reus to pass clear. See, on the general subject, The Sapphire, 11 Wall. 164, 20 L. Ed. 127; The Dutchess, 6 Ben. 48. Fed. Cas. No. 4,205; The Clara, 102 U. S. 200, 26 L. Ed. 145; The Clara Goodwin (D. C.) 143 Fed. 172.

We do not think the suggestion that the Maraval should have separated from the Reus immediately after the collision is important, even if she could have done so, because no substantial damage occurred after the first contact.

While no confident or absolutely satisfactory conclusion can be come to, we think that both vessels were at fault, and that the decrees should be reversed, with directions to the court below to direct a reference to ascertain the damages sustained by the Maraval if not agreed upon and then to enter the usual decree against both vessels for half damages and half costs of both courts.