## THE IRISHMAN.

(District Court, E. D. Virginia. June 19, 1919.)

COLLISION ☞72(1)—DAMAGES—LIABILITY.

On a libel for damages which resulted in a harbor when a schooner of which libelant was master was carried by drifting ice floe into collision with a steam vessel, *held*, under the circumstances, that both vessels were at fault and the damages should be divided; it appearing that the master of the schooner, though knowing the perilous position, left navigation in the hands of a navigator whose competency was not vouched for, and who attempted to use two anchors when one would probably have been better, while the steamer was at fault in failing to take steps to avoid collision which it could see was imminent, although it had steam up.

In Admiralty. Libel by Luis Maresco, master, against the steamship Irishman, to recover for damages sustained by the vessel, of which libelant was master, in a collision. Damages divided.

J. Westmore Willcox, of Norfolk, Va., for libelant.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for respondent.

WADDILL, District Judge. On the night of Saturday, January 5, 1918, about 12 o'clock, the three-masted schooner Rio Negro, about 200 feet long and 36 feet beam, light, came into collision with the steamship Irishman, a large ocean-going steamship, 520 feet long, 62½ feet beam, 26.8 feet deep, in the harbor of Newport News, Va., about three-quarters of a mile off a point between the Chesapeake & Ohio Railway coal pier and Newport News Point, the result of which was that the schooner was considerably, and the steamship slightly, damaged, and to recover for the damage to the schooner this libel was filed.

The schooner had been at anchor several weeks, and the steamship came in a day or two before the collision involved in this case, and was anchored within about 1,500 to 2,000 feet southeast of the Rio Negro. The harbor was, and had been for between two and three weeks, blocked with ice, which was beginning to break and drift at the time of the collision. Vessels in the harbor had frequently dragged from their anchorage during the breaking up of the ice field, and the Rio Negro dragged several times, and for a period of eight

days she had not been able to communicate with the shore. On the day of the night of the collision, she collided with an American vessel, her jibboom coming in contact with the same, causing slight injury, and during the day it was evident that she was drifting in the harbor, and the probability of the respondent ship becoming endangered thereby was patent to her navigators as early as 5 o'clock in the evening. The situation became more acute as the evening wore on, especially from 7 to 9:30, when at the latter hour the schooner's stern bumped into the bow of the Irishman, injuring her davits to some extent. The ice forced the bow of the schooner around, and her anchors finally became entangled with those of the Irishman. Subsequently, about 12:30 a. m., the collision, the subject of this litigation, occurred, the jibboom of the schooner crossing the bow of the Irishman, and striking and becoming entangled with her foremast.

The schooner insists that she was free from fault, and that she was caught in the drifting ice, and driven into and against the Irishman, and that no anchor she had or could have procured would have averted the disaster; that the collision was solely the result of the fault of the Irishman, in that she failed to exercise proper nautical skill, after observing the impending danger in which the schooner was placed, by not paying out additional chain anchor, so as to enable her to escape the drifting schooner, or by not steaming up on her engines, and getting out of the way of the helplessly drifting schooner.

The Irishman insists that she was safely anchored in the harbor, where she had the right to be, and where she had been placed by a compulsory Virginia pilot, and that she in no manner was to blame for the schooner's unnecessarily and negligently dragging into and colliding with her; that in the then crowded condition of the harbor, although she had steam up, it was impracticable for her, considering her size and depth, being heavily laden, and the tide running strong, to raise her anchors and secure anchorage elsewhere; that upon lifting her anchors there would have been great danger of drifting and coming into collision with other vessels astern, and in either event, with her great draft, she might have grounded, which would probably have resulted in disaster to herself, as well as other shipping.

Much testimony was taken as to what the respective vessels should or could have done in the perilous positions in which they were placed, and there is a sharp conflict as to what should have been done, and the court's conclusion and judgment, upon a full consideration of the evidence, is that both vessels were to blame for the happening of the accident.

There is much force in the Irishman's contention, but it is clear to the court that the perilous condition of the schooner was apparent to her a sufficient length of time prior to the collision to impose upon her the burden of doing something to avert it, and that having steam up she might, without appreciable danger to herself, have moved to a safer place of anchorage. She did nothing, and apparently relied upon her great strength as security against danger from this weaker vessel.

Sight should not be lost of the fact that this steamship, unlike the schooner, was not helpless in the ice floes. Relying on her ability to withstand the conditions, and with knowledge of their existence, she voluntarily chose to go up into and anchor in this harbor, which was well-nigh closed as the result of ice conditions then prevailing, and at the time of the collision she had steam up, and could have controlled her movements.

Considering the liability of the schooner for the happening of the accident, it cannot be said that there was much she could have done that she did not do to avoid the collision. Still, as the vessel drifting into one at anchor, she should be entirely free from fault, which was not the fact here, as respects matters contributing to bring about the collision. Her master, certainly, for the time immediately preceding the collision, does not appear to have exercised the degree of care that prudence and good seamanship imposed upon him in the emergency in which his vessel was placed. The danger to the schooner while drifting, as well as to other shipping in the harbor, was critical, and for some hours before the accident, when he concedes these conditions existed, he should have given personal attention to the difficulties and dangers that were constantly presenting themselves in the navigation of his vessel, and not have left them to another, whose competency as a navigator is not too well vouched for. His vessel appears to have had two anchors out in the drifting ice. This is not always the best and most prudent thing to do, as two anchor chains tend to form an obstruction against which ice will gather and pack, when with a single anchor chain the likelihood of an accumulation of ice would not be so great, and the chance of the ice parting and going on either side of the vessel would be increased. Just how far this circumstance may have entered into the collision is not apparent, but it was liable to produce it.

Moreover, the fact that the schooner had been exposed to the dangers it had been for a great length of time, and the fact that her jib had already collided with one vessel, would not have made it entirely unreasonable to suggest to her navigators the importance of taking in the jibboom as an extra precaution, although from the testimony such seems not to be usually the custom in American ports. Had the collision in this case occurred without the fault of either party, there could have been no recovery, and had it been inevitable so far as either one is concerned, and that party had been free in all respects from fault, no liability would attach to that one. This case belongs to neither class. The collision occurred as the result of the negligence of the navigators of both vessels, and it is so determined, and the damages resulting should be divided.

An order so ascertaining, and decreeing the damage to be borne equally between the parties, will be entered on presentation.