## THE BALTIMORE.

### GILBERT et al. v. SWART.

(Circuit Court of Appeals, First Circuit. October 3, 1922.)

No. 1540.

1. **Collision ⬅72(1)—Anchored steamship held chargeable with contributory fault for not moving.**

   An anchored steamship *held* chargeable with contributory fault for collision with a barge which, being insecurely anchored, had dragged her anchors and for several hours had been so near the steamship that danger of collision with change of tide should have been apparent, and where there were only two men on the barge who could not change her position, but the steamship had steam up, and could have moved or have gone forward on her anchor chain sufficiently to be safe from the barge.

2. **Collision ⬅20—Duty of vessel to avoid threatened collision.**

   That one vessel has committed a gross fault does not absolve another, with which it is in danger of colliding from the duty to use such precautions to avoid the collision as prudence and good seamanship may dictate.

3. **Collision ⬅69—Duty of anchored vessel to act to avoid collision.**

   It is the duty of a vessel at anchor to adopt such means to avoid a threatened collision as can be taken without extraordinary risk.

4. **Collision ⬅154—Costs in collision suit.**

   Where two vessels were each in fault for a collision, but only one was injured in a suit for such injury, she is entitled to recover full costs.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Suit in admiralty by Tjebbe Swart against the barge Baltimore; Osgood A. Gilbert and others, claimants. Decree for libelant, and claimants appeal. Reversed.

For opinion below, see 265 Fed. 409.

George L. Dillaway, of Boston, Mass. (Manson M. Dillaway, of Boston, Mass., on the brief), for appellants.

G. Philip Wardner, of Boston, Mass., for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. The Dutch steamship Eemdjik, having taken on a cargo of grain at Boston, was anchored on the 26th of February, 1917, in Boston Harbor. She was 300 feet long and, as loaded, drew 19.6 feet forward and 23 feet aft. She had down her starboard anchor weighing about two tons and was riding to 75 fathoms of anchor chain. On the evening of March 4, 1917, a tug left two unloaded barges, the Baltimore and another tailing her, at anchor from one-half to three-quarters of a mile to the northeast of the steamship. The Baltimore was 192 feet long and 32.6 feet wide, and drew, when unloaded, 18 inches forward and about 2 feet aft. She had two anchors, one of 1,000 pounds and the other of 700 pounds weight, and both were put down. No anchors were dropped by the other barge, which was

held by a hawser from the Baltimore. There was a pretty stiff breeze blowing, and it was snowing when they were left. The wind increased during the night; but at no time, according to the report of the Weather Bureau, could its velocity be characterized as unusual. The Baltimore was unable to hold with her anchors and dragged toward the steamship, so that at about 10 o'clock on the next morning, when a tug came out and took off the barge which was tailing upon the Baltimore, the latter was nearly abreast of and from 500 to 1,000 feet easterly of the steamship, according to the testimony of the master of the barge, and about 300 feet, according to the testimony of the captain of the steamship.

After the tug had taken the other barge the Baltimore continued to drag her anchors and to get nearer to the steamship, and at 8 o'clock in the evening was within 30 or 40 yards, with her bow opposite a point from 15 to 20 feet from the stern of the steamship. The captain of the steamship was alarmed by the proximity of the Baltimore and called out to the men aboard of her to let out more anchor chain, giving as his reason for doing this that he was afraid the barge "would come too tight up." The barge did not slacken her anchor chains, and nothing was done aboard of her to relieve the situation. There were only two men on her, and they could not raise her anchors, which could only be done by means of a capstan worked by hand spikes. She had no means of propulsion, and her helplessness must have been apparent to the captain of the steamship. The tide was then flood and would be high about 9:30 that evening.

Nothing was done by the steamship to avert any collision that might occur from the dangerous proximity of the barge. The captain of the steamship testified that he remained upon deck until about 11 o'clock; that the wind was very light then, and it was moonlight, and he thought the barge was lying "safe off" and went below. About 12 o'clock he was called, and the bow of the barge had struck the starboard stern of the steamship and was overlapping it 15 or 20 feet. He again called upon the master of the barge to slacken his chains, but the latter replied that he could not do so, as he had all his chain out. The captain of the steamship then ordered his steamship to go ahead upon her anchor chain. She had out 75 fathoms, and, by going ahead and taking in 30 fathoms, the barge, although colliding with the stern of the steamship, was enabled to pass aft of her and to a place of safety. In doing this the steamship received the damage which is the subject of its libel.

The steamship rode for the remainder of the night with 45 fathoms of chain out, and on the next morning the barge came up again on the starboard side of the steamship and collided with it again, causing slight damage. The two men aboard the barge were unable to raise its anchors, and the captain of the steamship sent eight of his crew aboard the barge to assist them in doing so. After the anchors were hove up the barge drifted to a position clear of the steamer.

[1] The District Court has found that the barge was solely at fault because she was improperly anchored. That the initial fault was with the barge clearly appears. She was improperly anchored, with

another barge hanging to her, and was left with an insufficient number of men to raise her anchors if occasion required. In dragging her anchors she gave the steamship a foul berth, but we do not think the steamship was free from fault. She was deeply loaded and consequently more affected by the tide than the barge, which, with her light draft and freeboard of 10 feet and the house built upon her, was less affected by the tide and more by the wind than the steamship.

The master of the steamship should have known from his experience as a seaman that, when the tide began to ebb, the steamship would be swung by it toward the barge, which, because of its light draft, would not be affected by the tide to the same extent as the steamship; that the barge, because of its more exposed freeboard, would be kept up by the wind, and that the collision would occur which he seemed to fear at 8 o'clock in the evening. If the barge had slackened her chains or got up her anchors, she could have passed the stern of his vessel without collision; but he knew the men aboard of her had not done this. His vessel had steam up, and it would have taken only a few minutes for her to have gone forward on her anchor chain so that she would swing clear of the barge, or the anchor could have been weighed and she could have gone ahead for her length.

The tide was slack at about half past 9 on that evening; the wind had then decreased; the weather was clear; there were no craft of any kind nearer the steamship than 300 to 350 yards and there would have been no extraordinary risk in making such a slight change in her anchorage; and certainly the steamship could have gone ahead upon her anchor chain before the vessels came together, as she did after the collision occurred. It was the duty of the captain of the steamship to know the condition of the tide and to forecast its probable effect upon his deeply laden vessel and the lighter craft to his windward and in close proximity, whose draft was only 18 inches. No sudden emergency had arisen, and with his vessel at anchor and steam up he made no effort for several hours to take any measures to prevent a collision with this barge which had been dragging toward him for a whole day, so that at 8 o'clock it was less than half the length of the steamship away and so near that upon the change of the tide from flood to ebb, with the wind continuing to blow from the same quarter, a seaman of ordinary experience should have expected a collision. The situation presents such clear proof of fault on the part of the steamship that it overcomes the presumption in its favor.

[2] That one vessel has committed a gross fault does not absolve another, with which it is in danger of colliding, from the use of such precautions to avoid the collision as prudence and good seamanship may dictate. The American, 92 U. S. 432, 438, 23 L. Ed. 724; The Maria Martin, 12 Wall. 47, 20 L. Ed. 251; The Manitoba, 122 U. S. 108, 7 Sup. Ct. 1158, 30 L. Ed. 1095; The Clara, 102 U. S. 200, 203, 26 L. Ed. 145.

[3] That it is the duty of a vessel at anchor to adopt such means to avoid a threatened collision as can be taken without extraordinary risk has been held in the following cases: The Sapphire, 11 Wall. 164, 20 L. Ed. 127; The Anerly (D. C.) 58 Fed. 794; The Ciudad de Reus,

185 Fed. 391 (C. C. A. 2d Cir.) 107 C. C. A. 447; The Irishman (D. C.) 259 Fed. 301; The Bacchus (D. C.) 267 Fed. 468.

We think the steamship, upon the evening before the collision, could have gone forward on her chains sufficiently far to have allowed the barge to have passed under her stern without collision or that she could have changed her anchorage without any extraordinary risk, and that the District Court erred in holding that she was without fault.

[4] As all the damage was suffered by one vessel, and no cross-libel or counterclaim was filed, the libelant, under the rule in this circuit, should recover full costs in the court below. See Pennsylvania R. Co. v. Golden et al. (D. C.) 243 Fed. 256, 258, where the practice in this circuit as to costs in cases where a division of damages is ordered is discussed.

The decree of the District Court is reversed, with costs to the appellant in this court, and the action is remanded to that court, with directions to enter a decree for the libelant for one-half of the damages assessed and full costs.