### THE WINNECONNE.

### UNITED STATES v. WINNECONNE S. S. CO. et al.

### No. 6266.

Circuit Court of Appeals, Fifth Circuit.

June 29, 1932.

Rehearing Denied Aug. 1, 1932.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., W. B. Spencer, Jr., Asst. U. S. Atty., and W. I. Connelly, Atty., U. S. Shipping Board, all of New Orleans, La.

Henry H. Chaffe and Jas. Hy. Bruns, both of New Orleans, La., and John C. Prizer, of New York City, for appellee.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

During a sudden squall on the Mississippi river in the harbor of New Orleans on March 31, 1921, the steamship Cecil County, belonging to the United States, came into collision with the steamship Winneconne, belonging to Winneconne Steamship Company and broke her loose from her anchorage, the Winneconne afterwards striking four other ships belonging to the United States and the Cecil County striking one or two more. Several libels and cross-libels in rem and in personam followed which were consolidated and tried in 1928 along with interventions of insurers who claimed subrogation; the Cecil County being held alone at fault and decree for damages done the Winneconne going in favor of her owners and insurers against the United States, the latter appealing.

The squall occurred in early morning while all the ships concerned were at anchor and few persons were astir on them. It lasted only about ten minutes, and was accompanied at its height by rain so heavy as to prevent sight of the shore and to render visibility poor for nearer objects. In addition to these difficulties of observation, many years elapsed before some of the important witnesses were examined, so that it is more than usually necessary to depend on the probabilities arising from the general circumstances in reconciling the testimony. The river at the point in question runs approximately southeast with a current of about four miles per hour. Its width is a half mile. The depth is sixty feet, and the bottom is mud,

affording a good anchorage. The vessels involved, together with many others, were anchored on the southwest side of the center of the river, each with one anchor out and about 45 fathoms of chain in the water, a usual and sufficient amount in good weather, but too short to stand much wind. All the vessels hung straight down stream from their anchors in the absence of wind sufficient to counteract the current. The Cecil County anchored March 5, 1921, with no other vessel off her starboard. The Winneconne anchored March 23d somewhat to starboard of the Cecil County and to her rear; the exact distance being disputed. The other vessels injured were to the rear and to port of the Winneconne. Just before 6 a. m., on March 31st a violent squall came from the north and northwest, preceded, as some testify, by a strong wind from the south and accompanied by blinding rain. Weather Bureau reports, which being required by official duty to be kept were properly admitted in evidence over objection (Evanston v. Gunn, 99 U. S. 660, 25 L. Ed. 306), show that in New Orleans, three or four miles to the northwest of the ships, there was a south breeze of as much as 10 miles per hour from 5 to 5:48 a. m.; that at 5:48 a wind came suddenly from the northwest at 30 miles per hour, rising to 43 miles by 5:51. It dropped to an average of 24 miles from 6:01 to 7, and heavy rain fell from 5:47 to 5:57. The Cecil County was a tanker of 10,250 tons dead weight, and measuring 450 feet over all, and was riding light, with bow 30 feet out and only 4 feet under water, but with stern which contained her machinery drawing 17 feet. The Winneconne was of 5,100 tons dead weight and 315 feet long, also light, and drawing 6 feet forward and 12 feet aft; her bow being 20 to 24 feet above water. All witnesses agree that a south wind coming on the port quarter would at first veer the light high bows to starboard, the ships pivoting on their deeper sterns; the wind affecting most the bow and the current the stern. The wind continuing steady would next press the whole ship to starboard; the anchor tending to hold the bows back to port until an equilibrium should be established with the ship swinging to leeward of her anchor athwart the current to an extent determined by the relative strength of the wind and current, and heading somewhere between the two. We think this happened to the Cecil County and to the Winneconne, resulting in the stern of the Cecil County passing out into the river and beyond the bow and anchor chain of the Winneconne, and the swing of the Winneconne being also such as to cause

the whole of the Cecil County to appear off her starboard bow to those on board the Winneconne. The south wind was probably not so strong as testified by some, but must have been sufficient to thus place the ships in order to explain the subsequent occurrences. When the sudden and violent wind came from the northwest, it struck both ships on the starboard bow, veering the bows suddenly to port so as to point to the port rather than the starboard of their respective anchors; the slack in cable produced by the south wind making a considerable veer across the current possible before the bows were again brought up by their anchors. When so brought up by the anchors, the combined force of wind and current should next have swung the sterns to shoreward, with a final result that each vessel would again hang to leeward of her anchor and would head between wind and current, but with so strong a wind almost into the wind. We believe, however, that while the Winneconne, whose anchor held, behaved thus, the Cecil County whose bow offered so much more surface to the wind and was less in the water swung more violently, and in bringing up on her anchor dragged it, and then with wind and current nearly abeam continued to drag it down the river and slightly shoreward till the keel near the stern struck the anchor chain of the Winneconne, rode up it till it broke, and the vessels collided, the port quarter of the Cecil County striking upon the stem of the Winneconne. The Winneconne thus set adrift started down the river and shoreward in contact with the Cecil County, but the latter's bow being retarded by the dragging anchor its stern continued to hug the starboard bow of the Winneconne, preventing the latter from dropping her starboard anchor at once until the Winneconne gained speed enough to drift clear. The Cecil County then passed further shoreward to strike the Belle Pine and perhaps the Seneca, when having paid out more cable her dragging anchor began to hold and she brought up on it. The Winneconne dropped her starboard anchor when clear and paying out 60 fathoms of chain sought to check up on it but could not, and the chain parted at 90 fathoms, leaving her helpless to strike other ships below. This, we think, is what occurred.

We absolve the Winneconne from blame for her collisions when adrift, because we find that she was well anchored until struck by the Cecil County, that she dropped her second anchor as promptly afterwards as possible, and was not at fault in that her mo-

mentum and the wind and current were such that she could not then be held by her chain, which is testified to have been duly inspected and in good condition. The testimony that with the depth and bottom there present it was bad seamanship to pay out 90 fathoms of chain before beginning to check the ship does not cover the situation, because the checking began at 60 fathoms and continued until the chain parted at 90 fathoms. The Cecil County was dragging with 45 fathoms out, and had to pay out more than 60 for her anchor to hold even after her momentum was checked by collisions with other ships. We also reject the contention that the original fault was with the Winneconne in giving the Cecil County a foul berth by anchoring too close, so that the Cecil County in swinging normally caught the Winneconne's chain and was thus caused to drag anchor. When the Winneconne in charge of a licensed river pilot came to anchor on March 23d there was no vessel to starboard and none aft of her. She had any desired space in either direction. The master of the Cecil County, corroborated by his mate, states that they were on the bridge when the Winneconne came alongside, and dropped anchor about 60 feet to his starboard and between his poop and beam, paying out 45 fathoms so as to ride with bow only 100 feet below his stern. He and every other witness stated that such an anchorage would foul his berth; yet he made no protest to the Winneconne then or during the next eight days, and took no means to secure the safety of his own vessel. The pilot, master, and others on the Winneconne say they dropped anchor a ship's length astern and slightly to the starboard of the Cecil County, and brought up two ship's lengths from her, about the distance from their neighbors at which several other vessels are testified to have been anchored. It is so highly improbable that without any reason or necessity a plainly foul anchorage should have been thus made in broad daylight, and that, if it was, no protest or action to rectify it should have been undertaken by the Cecil County in eight days (see The Sapphire, 11 Wall. at page 170, 20 L. Ed. 127), that we think the truth is with the witnesses who deny it.

The damage having been occasioned without the fault of the Winneconne and by the Cecil County dragging her anchor, there remains the question whether the Cecil County was without fault and the damage due to unavoidable accident by the action of nature. In testifying shortly after the occurrence, the master of the Cecil County stated that the anchor which he had out was not one of his original bower anchors, but a spare anchor which he had substituted for the regular starboard anchor several weeks before in another port, and which weighed near two tons. The engineer said it weighed one ton. Additional testimony taken in this court after appeal tended to show that the ship was equipped eight months before with two bower anchors weighing 9,387 and 9,367 pounds, a spare anchor weighing 7,490 pounds, and two lighter ones, and that the anchor of 7,490 pounds was the one substituted for the starboard bower and used to anchor in the Mississippi. We take this testimony as the truth, and that the anchor with 45 fathoms of cable was sufficient for fair weather. Yet because of the anchor's lightness we think there was added reason for watchfulness and readiness to pay out chain or drop the other anchor in case of need. Whether the port bower anchor had ever been used or its windlass inspected since installation does not appear, but when in emergency it was sought to let it go the brake was found screwed up so tight it could not be released by the wheel provided. A wrench which would have sufficed was in its place, but no one on the forecastle knew where to look for it, and the boatswain with a sledge-hammer struck and broke the release wheel in an effort to loosen it. The anchor was never let go. Of the many ships that were in the squall only two others are mentioned as having gotten adrift, the Seneca and the Nobles. The Seneca lost two anchors and is positively testified to have been hit and set adrift by the Cecil County, though the officers of the latter deny it. No details as to how the Nobles got adrift appear. We think all these circumstances sufficient to show fault with the Cecil County. Compare The Severn (D. C.) 113 F. 578; The Clara Goodwin (D. C.) 143 F. 172; The Williams E. Reis (C. C. A.) 152 F. 673; The Ciudad de Reus (C. C. A.) 185 F. 391. Since fault there was, the effects of the storm cannot be claimed as inevitable accident. The Louisiana, 3 Wall. 164, 18 L. Ed. 85; Union Steamship Co. v. New York & Virginia Steamship Co., 24 How. 307, 16 L. Ed. 699; The Morning Light, 2 Wall. 550, 556, 17 L. Ed. 862; The Mabey and The Cooper, 14 Wall. 205, 215, 20 L. Ed. 881; The Colorado, 91 U. S. 692, 703, 23 L. Ed. 379. The amount of damage suffered by the Winneconne is not in dispute.

The decree for its recovery against the United States and for dismissal of the cross-claims of the United States is affirmed.