## THE MISHAWAKA.

## THE BLANCHE GILLIES.
### No. 1364.

District Court, D. Maine, S. D.
April 1, 1935.

N. W. Thompson, of Portland, Me., for the Blanche Gillies.

William B. Nulty, of Portland, Me., for the Mishawaka.

PETERS, District Judge.

These are cross-libels. The first is a libel by the owner of the schooner Blanche Gillies against the oil screw vessel Mishawaka to recover damages sustained in a collision between the two vessels, and the

second is a libel by the owner of the Mishawaka against the schooner Gillies claiming salvage for repairing the schooner and taking her to port after the collision.

I find the facts to be as follows:

The schooner Gillies, a small auxiliary vessel, with the captain and a crew of one man, on October 3, 1934, had proceeded to a point about six miles southeast of Fishermen's Island, off this coast, and anchored on a fishing ground where the captain expected to fish the next day. She was riding at anchor with all sails furled except the mainsail, which was trimmed flat to keep the vessel head to the wind. She arrived at this position about 8 p. m. on October 3d, and a white riding light was immediately set in her fore rigging and a watch set on deck.

On the same night the Mishawaka was proceeding from a fishing ground, where she had been fishing, to Portland to sell her fish. She was an oil screw vessel fifty feet over all, fourteen feet beam, drawing five feet of water. Her pilothouse, within which all navigation was done, is located about thirty to thirty-five feet aft of the stem. Directly in front of the pilothouse is a mast. In the pilothouse the helmsman stood behind the binnacle, which is behind or just below the windows in the pilothouse. The engine was also operated from the pilothouse.

The weather on the night in question was dark but clear, with starlight, and a breeze from the north.

The Mishawaka with her load of fish was proceeding at her usual speed of about seven and a half knots, with a man in the pilothouse in charge of navigation steering a compass course. There was no lookout whatever on the Mishawaka, and no man on deck except the helmsman in the pilothouse. At about 10 o'clock on the night in question, while so proceeding, the Mishawaka struck the Gillies about amidships on the starboard side and opened her side nearly to the water. Some of the crews of both vessels obtained necessary materials and nailed up the hole in the side of the schooner so that water would not wash in, and the Mishawaka towed her to Portland.

The helmsman of the Mishawaka did not see the schooner, and only identified her riding light immediately before the accident. He testified, however, that he saw some kind of a light some little time before the collision, but did not change his course or slack his speed. He "just waited." Shortly he saw what he thought was a red light; but he evidently saw but one light and that was the riding light of the schooner, and no red light, because none was set.

The Mishawaka was a handy vessel and could turn in about her own length.

On the schooner, the captain was on watch; the other man down below resting. The captain went below occasionally to put fuel in the stove. His vessel was less than fifty feet over all, and with twelve feet beam. It must have been only a few steps to the galley stove. The captain of the schooner testified: "I went to go down and fix the fire—I couldn't see or hear anything coming—and when I got to the foot of the stairs I heard a heavy engine running and it sounded pretty handy, and I run right up on deck, and—well, inside of three or four minutes—perhaps five minutes—I see them burst into view; and saw their lights."

He testified that then the Mishawaka was three or four lengths distant but far enough so that they could have avoided the collision if they had put their helm hard either way. On being asked what then happened, he further testified: "Well, they was coming so fast I couldn't get a chance to do anything. I was going to run and get the horn to blow it, but I didn't have time. They were right on to me. So I made a dive for the dory."

The captain further testified that the other vessel did not diminish her speed, no bells were rung, and that he shouted at the oncoming vessel but could not make them hear. The collision occurred about the time he shouted.

On cross-examination he testified as follows:

"XQ–17. How long do you think it was from the time you heard the engines before the collision? A. Well, it was about four or five minutes.

"XQ–18. How long? A. Four or five minutes, perhaps. Four minutes.

"The Court: What did you do in that time? A. Well, I don't—Gee! I could hear the engines before I could see them. I didn't know what it was. When I—

"The Court: Didn't you get the horn— or megaphone? A. No. Well, I have *got* a horn. Yes.

"XQ–19. You didn't get it, did you, Captain? A. No. I didn't get a chance.

"XQ-20. You said four or five minutes? A. I was looking to see whether that boat was going by me or where she was going.

"XQ-21. And you used up four or five minutes to do that? A. Well, I waited until I could see them. Yes.

"XQ-22. Did you have any flares on board? A. No.

"XQ-23. So you gave no other signal than by shouting on a windy night? A. That's all I had a chance to do.

"XQ-24. You said you heard the boat coming four or five minutes? A. Yes, but I didn't know they were coming directly at me."

There can be no doubt as to which vessel was at fault. The schooner was lying at anchor at a not improper place, near the fishing ground, with the required anchor light burning and a watch on deck. There was no occasion for sounding a fog horn, as there was no fog.

The motor vessel was running at her usual speed without the required lookout; the only man on deck being an elderly appearing helmsman, somewhat deaf, steering a compass course and stationed in a pilothouse on the after part of the vessel behind a mast.

It is wholly reasonable to assume that a competent lookout on the bow of the motor vessel would have seen the riding light of the schooner in ample time to avoid her. Indeed, this is hardly denied by the claimant; but it is claimed that the captain of the schooner, having knowledge of the approaching vessel, did not take proper precautions to avoid collision. It is contended that, there being fault on both sides, damages should be divided.

The case of The Baltimore (C. C. A.) 283 F. 728, 730, in this Circuit, is relied upon. It is there stated: "That one vessel has committed a gross fault does not absolve another, with which it is in danger of colliding, from the use of such precautions to avoid the collision as prudence and good seamanship may dictate." And "That it is the duty of a vessel at anchor to adopt such means to avoid a threatened collision as can be taken without extraordinary risk."

It should be noted that in The Baltimore Case both vessels were at anchor, and it was a matter of dragging anchors for some hours before the collision, with ample time to get out of the way.

A different rule prevails where one vessel is anchored and observing the rules of navigation, and the other is a moving vessel under control. In that case the duty of avoiding the collision is wholly upon the vessel in motion. The Lucille (D. C.) 169 F. 719.

"All these inquiries are superfluous where the collision was caused by a vessel having the power to move or stop at pleasure in a channel of sufficient breadth, without any superior force compelling her to the place of collision. The fact that in these circumstances the steamboat did collide with the barge is conclusive evidence that she was not properly managed, and that she should be condemned to pay the damages caused by the collision." The Granite State, 3 Wall, 310, 314, 18 L. Ed. 179.

But without regard to presumption, it does not appear that any fault is to be attributed to the captain of the schooner. The libelee relies on the captain's testimony that he heard the noise of a heavy engine a few minutes—he calls it four or five minutes—before the collision, and did not do anything. Just what he could have done is not quite clear. To blow a horn would have been apparently futile, as the only man on the deck of the motor vessel was in the pilothouse, "hard of hearing," as he said, and standing over the heavy engine with an exhaust out of the side nearby. The schooner already had a light burning and the weather was clear.

I place little weight on an estimate of time under such circumstances, given many months after the occurrence. It is of more significance when the captain of the schooner testified that he did not get a chance to do anything after he knew the motor vessel was coming directly at him. If he had known that the vessel whose motor he heard shortly before the accident was coming toward him, both at full speed and blind, he probably would have been moved to some extraordinary exertion. However, it is not apparent what he could have done with any effect, or that he had time for any thought after he became aware of the danger.

The field of responsibility for the accident is so fully occupied by the motor vessel that there is no place for the schooner.

I can find no reason for dividing damages.

In the matter of the libel of the motor vessel against the schooner, it is clearly not a proper case for salvage. The motor vessel cannot be both destroyer and salvor. The latter role imports an absence of pre-

existing contract, obligation, or duty in relation to the property saved. The captain of the vessel at fault was in duty bound to reduce as much as possible the damage he had caused. In helping to repair the schooner and towing her in, he was really acting in his own interest from a financial point of view.

The libel against the motor vessel is sustained with costs.

The libel against the schooner is dismissed. One bill of costs only.