**MICMAR MOTORSHIP CORPORATION, Plaintiff,**

v.

**CABANELI NAVIERA S.A., in personam, MS THEODEGMON, her engines, tackle, furniture, apparel, etc., in rem, Defendants.**

Civ. A. No. 76–2095.

United States District Court, E. D. Louisiana.

July 31, 1979.

M. D. Yager, New Orleans, for plaintiff.

Robert B. Fisher, Jr., New Orleans, for defendants.

CASSIBRY, District Judge:

This case was submitted to the court on depositions, exhibits and briefs. After careful consideration of those materials and the applicable rules of law, I have decided in favor of the defendant. My findings and conclusions are set out below.

I.

The M/T THEODEGMON is a motor tanker with an overall length of approximately 201.5 meters and a breadth of 36 meters. It has diesel engines. At all times relevant to this action, it was owned by the defendant Cabaneli Naviera, S.A. The M/V MISTER MICHAEL is a merchant vessel approximately 227 meters long and 28.5 meters wide. At all times relevant to this action, it was owned by the plaintiff Micmar Motorship Corp.

On the night of January 12, 1979, the THEODEGMON was heading upstream in the Mississippi River. It was traveling on the right-hand, or eastern side of the river. The master of the ship was Stavros Samaras (Stavros). Its Mississippi River pilot at the time was Richard McNeely. At about 10:30 P.M., as the THEODEGMON arrived at the vicinity of the New Orleans General Anchorage, it sustained a sudden and complete loss of power that eliminated all its engine, steering, radio, lights, and whistle facilities. The THEODEGMON began to fall off to port, in the direction of the General Anchorage, which is along the western bank of the river. As the vessel continued to fall off in this direction, McNeely ordered the starboard anchor let go in an effort to stop his drifting ship. Subsequently, he ordered the port anchor let go. The THEODEGMON, however, entered the general anchorage and collided with a Swedish vessel called the MALMLAND at approximately 10:38 P.M. Shortly after the collision, several tugboats came to the assistance of the THEODEGMON. They maneuvered the THEODEGMON away from the MALMLAND and for several hours held it parallel to but somewhat behind that vessel, on the starboard side.

The MISTER MICHAEL was anchored immediately astern and slightly starboard of the MALMLAND. It, in turn, had various vessels near it in the general anchorage. Perantinos Stamatios (Perantinos) was the master of the MISTER MICHAEL. No Mississippi River pilot was aboard the vessel at the time the THEODEGMON collided with the MALMLAND. A pilot, Irvin Janssen, came aboard at 1:48 A.M. on January 13, 1979. After conferring with the master of the MISTER MICHAEL about the circumstances surrounding the collision that had taken place immediately in front of the vessel, Janssen recommended that the MISTER MICHAEL not attempt to move from its current position. Perantinos followed that recommendation.[1] This action was based on a belief that the anchor chains of the THEODEGMON had crossed those of the MISTER MICHAEL. Any maneuver that the MISTER MICHAEL might have attempted in order to get out of its position in the general anchorage would have required the lifting of its anchors.[2] The MISTER MICHAEL remained at the

1. All the pilots and masters in this case agree that the final responsibility for decisions concerning whether or not to move a vessel under these circumstances lies with the master. The pilot gives advice which, though usually persuasive to the master, is not binding upon him.

2. Although Perantinos testified at one point that the physical position of the THEODEGMON next to the MALMLAND itself prevented him from moving the MISTER MICHAEL, this concern was based on his belief about the anchor lines. The MISTER MICHAEL could have

dropped back (downstream) somewhat in an attempt to maneuver around the THEODEGMON and MALMLAND, but it would have had to lift the anchors before attempting to do so. Except for the THEODEGMON, the other ships near the MISTER MICHAEL in the general anchorage were located at proper distances. Vessels often have to drop back (downstream) among the ships anchored aft before leaving the general anchorage. The MISTER MICHAEL could have done so, but its master and pilot believed the anchor chain to be fouled.

general anchorage until after the THEO-DEGMON heaved in its anchors and changed its position at about 11:00 A.M. that morning.

In the instant action, the plaintiff complains that the THEODEGMON wrongly prevented the MISTER MICHAEL from being able promptly to steam upriver to take a berth that came available to it at the Bunge Grain Elevator. The MISTER MICHAEL did later take on grain at that elevator. The plaintiff therefore seeks to recover for the delay, plus associated damages.

## II.

An initial issue to be settled is whether the anchor chains of the MISTER MICHAEL and the THEODEGMON were in fact crossed. The plaintiff has failed to prove such entanglement. The only direct evidence on this point is the fact that when the THEODEGMON heaved in its anchors prior to its change of position at 11:00 A.M. on January 13, 1976, it did not disturb the anchor chains of the MISTER MICHAEL. Although not conclusive, this evidence strongly suggests that the chains were not in fact crossed, and plaintiff has not come forward with any evidence to induce me to find otherwise.

■ Plaintiff's case, however, does not depend solely upon the anchor chains having been in fact crossed. I conclude that, under the circumstances presented by the instant case, if the THEODEGMON, through its negligence, created a situation in which the MISTER MICHAEL, exercising reasonable judgment, considered itself prevented from proceeding upriver, the THEODEGMON will be liable for the damages the MISTER MICHAEL suffered from this apparent obstruction.

■ There is ample basis for such a rule of law in the instant case. Maintaining and protecting the free flow of commerce over navigable channels is a fundamental goal of the maritime law. *See generally* 33 U.S.C. § 409. Most often, courts are asked to decide whether one vessel ob-structed a channel and should therefore be liable for the damage resulting from another vessel's collision with it. However, under some circumstances a vessel creating an obstruction will be held liable not because another vessel collided with it, but because the other vessel could not pass and suffered damages as a result. *In Re Lyra Shipping Co., Ltd.,* 360 F.Supp. 1188 (E.D.La.1972); *In Re China Union Lines, Ltd.,* 285 F.Supp. 426 (S.D.Tex.1967). The existence of an obstruction may be a physical fact, as when an entire channel is completely and actually clogged. However, an obstruction may also be said to exist when passage *reasonably appears* to be blocked. Thus, in *The Caldy,* 153 F. 837 (4th Cir. 1907), the vessel NEW ORLEANS attempted to pass the anchored vessel CALDY on the southern side of a particular channel, and a collision occurred. The court held the CALDY liable for having obstructed the channel. In its decision, the court concluded that the northern side of the channel reasonably appeared to be obstructed by the anchor chains of the CALDY. It specifically found "no fault" in the NEW ORLEANS' belief that this was so. 153 F. at 840.

■ I find no negligence in pilot McNeely's handling of the THEODEGMON after the power failure. However, I consider that failure itself to be the result of negligence. The applicable law has been clearly stated in *Oil Transfer Corp. v. Atlantic Tankers, Ltd.,* 194 F.Supp. 920, 925 (S.D.N.Y.1961), *aff'd* 297 F.2d 367 (2d Cir. 1962):

[T]here is a presumption of negligence on the part of a drifting vessel. She must be held responsible for the resulting damage unless she can show affirmatively that the drifting was the result of inevitable accident or a *vis major* which human skill and precaution and a proper display of nautical skill could have prevented. [Citations omitted].

If a collision results from the failure of a ship's engine, the defense of inevitable accident is upheld only if the proof is convincing that the defect was really latent, and that it could not have been

discovered by the exercise of due diligence. The mere fact of failure, unexplained, does not warrant a finding of inevitable accident. [Citations omitted]. *Accord Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co.,* 33 F.2d 272, 274 (2d Cir. 1929). In the instant case, the defendant has not overcome this presumption of negligence. It has established simply that a certain generator failed, and that this generator had been installed, new, in the THEODEGMON fifteen months prior to the casualty. Defendant has put on no proof, however, of the cause of the failure of the generator, and has therefore not relieved itself of the presumption that its negligence was the cause of the ship's loss of power.

■ One foreseeable consequence of negligence with regard to a ship's generator is that it will lose power, collide with another vessel, and thereby block other ships' passage. Accordingly, if the MISTER MICHAEL reasonably believed itself prevented by the THEODEGMON from proceeding, it can recover damages for the obstruction thus caused by the THEODEGMON's negligence.

### III.

Pilot Janssen testified unequivocally at his deposition that, because of the likelihood that the anchor chains of the THEODEGMON and the MISTER MICHAEL were crossed, the only safe course of action on the part of the MISTER MICHAEL was to maintain its position. However, Janssen did not explain any of the facts upon which his conclusion was based. Indeed, he recalled extremely few specific facts about the night in question. He could not even recall how far the THEODEGMON was from the MISTER MICHAEL. His testimony, therefore, affords the court no opportunity to evaluate the reasonableness of the decision not to move the MISTER MICHAEL. This evaluation must rest entirely upon the testimony of the master, Perantinos. That is particularly appropriate, because Janssen was not on board the MISTER MICHAEL when the THEODEGMON collided with the MALMLAND and came to rest near the MISTER MICHAEL. His recommendation not to move the MISTER MICHAEL was based largely, if not completely on the information and opinion provided by Perantinos.

When Perantinos first saw the drifting THEODEGMON, he was aft on the starboard side of his ship. He testified that the THEODEGMON was about amidship with the MISTER MICHAEL, perhaps 100 meters away. He saw the port anchor chain paying out. According to Perantinos, as the THEODEGMON drifted toward the MALMLAND, it cut across the bow of the MISTER MICHAEL at a distance of about 35 to 40 meters. The MISTER MICHAEL had let out 4 shackles—100 meters—of anchor chain on its starboard side. Perantinos estimated that the starboard anchor was, in fact, resting 80 meters ahead of the bow of the MISTER MICHAEL, with the chain bearing at a 45° angle from the center line of the ship. Perantinos testified that he was certain that the port anchor chain paying out of the THEODEGMON as it drifted close by the MISTER MICHAEL crossed the starboard chain of the MISTER MICHAEL.

At about 12:30 A.M. on January 13, 1976, Perantinos learned that the MISTER MICHAEL had to depart by 2:00 A.M. to the Bunge elevator to pick up grain. He did not communicate with the THEODEGMON. Perantinos testified that once pilot Janssen came aboard at 1:48 A.M. and was told of the MISTER MICHAEL's situation, Janssen communicated with the THEODEGMON over VHF radio at about 2:00 A.M. According to Perantinos, Janssen told him that the THEODEGMON reported that it could neither pick up its anchors nor operate its engines. The decision was made not to move the MISTER MICHAEL. Pilot Janssen remained on board until about 9:00 A.M., when the MISTER MICHAEL learned that it had lost its berth at Bunge.

■ Perantinos' testimony is not sufficient to meet plaintiff's burden of proof in establishing the reasonableness of the decision not to move the MISTER MICHAEL.

The current in the Mississippi River at the time and place in question was quite slight, about 1 or 2 knots. I find it unlikely that the 100 meters of anchor chain that the MISTER MICHAEL had out would have been stretched so taut that the starboard anchor was in fact 80 meters ahead of the ship.[3] Further, Perantinos' estimate that the THEODEGMON passed the bow of the MISTER MICHAEL at a distance of 35 to 40 meters is open to serious question. This estimate is based upon Perantinos' view from the aft portion of a 227 meter ship. Distances between objects near the bow of the MISTER MICHAEL would, from that vantage point, have appeared closer than they actually were. Further, both the master and the pilot of the drifting THEODEGMON have testified to the effect that the THEODEGMON did not cut sharply across the bow of the MISTER MICHAEL before striking the MALMLAND. Rather, they say that the ship made a somewhat broad sweep from its initial location on the eastern side of the river over to the general anchorage on the western side.

Perantinos claims that Janssen called the THEODEGMON at 2:00 A.M. and was then informed that the THEODEGMON's anchors could not be picked up.[4] However, Stavros testified that his vessel did not receive any communication from the MISTER MICHAEL until about 9:00 A.M. He further stated that shortly after his vessel came to rest after the collision, his engineers were able to start the emergency generator. That generator gave the ship radio capacity. It also enabled the THEODEGMON to operate an auxiliary boiler to supply steam. The anchors on the THEODEGMON were steam-powered. Thus, Stavros testified that he could have, and in fact did to some extent, pull in his anchor chains shortly after the collision. On the THEODEGMON, Harold Butts replaced Richard McNeely as pilot at 8:45 A.M.

Both of these pilots testified that they knew pilot Janssen personally, referring to him by the nickname "Rusty." McNeely testified convincingly that he did not talk to Rusty Janssen while he (McNeely) was on board the THEODEGMON. He did not learn until some time later that Rusty Janssen had been the pilot of the vessel immediately astern of the THEODEGMON. Harold Butts, however, did recall talking to Rusty Janssen while he (Butts) was on board the THEODEGMON—and, as noted earlier, he came on board at 8:45 A.M. Considering all this evidence, I find that no communication took place between the THEODEGMON and the MISTER MICHAEL until about 9:00 A.M. on January 13, 1976.

The MISTER MICHAEL's silence is significant, for it belies her alleged concern over her inability to move. *The Winneconne,* 59 F.2d 660 (5th Cir. 1932). In that case, the court found that the vessel CECIL COUNTY had come loose from its anchorage and struck the vessel immediately astern and downstream from it, causing that vessel, the WINNECONNE, to break loose from her anchorage and drift downstream. The two vessels had been anchored in their respective positions for over a week prior to the casualty, the WINNECONNE having anchored subsequent to the CECIL COUNTY. The CECIL COUNTY claimed that the WINNECONNE was at fault because it anchored too close to the CECIL COUNTY. The court noted, however, that the master of the CECIL COUNTY "made no protest to the Winneconne then or during the next eight days, and took no means to secure the safety of his own vessel." 59 F.2d at 662. The court refused to believe the CECIL COUNTY's contentions on this point.

In the instant case, the MISTER MICHAEL did not communicate to the THEODEGMON for over eight hours after Peran-

---

**3.** In reaching this conclusion, I give no consideration to any of the photographs submitted by the defendant. Defendant has not established who took those photographs, at what time they were taken, or from where they were taken. They are inadmissible.

**4.** Janssen did not recall the particulars of his conversation with the pilot of the THEODEGMON, nor did he state the time at which this conversation took place.

tinos learned that his ship had to depart for Bunge. By the time such communication took place, the time had long passed for the MISTER MICHAEL to leave the anchorage. The tugboats attending the THEODEGMON were evident. Yet the MISTER MICHAEL did not ask the THEODEGMON to utilize those tugboats in an effort to make the way clear for the MISTER MICHAEL to leave. Stavros testified that he could have so utilized the tugboats. Thus, as in *The Winneconne, supra,* a vessel claiming that it was wronged made no timely protest and took no steps to alleviate the difficult position in which it claims it was placed.

On the basis of the foregoing, I conclude that the plaintiff has failed to establish that the MISTER MICHAEL reasonably considered itself obstructed by the THEODEGMON such that it can recover the damages it seeks here. There should be judgment in favor of the defendant.