Mr. Justice BR ADLEY
 

 delivered the opinion of the court.
 

 The first question raised is as to the right of the French Emperor to sue in our courts. On this point not the slightest difficulty exists. A foreign sovereign, as well as any other foreign person, who has a demand of a civil nature against any persou here, may prosecute it in our courts. To deny him this privilege would manifest a want of comity and friendly feeling. Such a suit was sustained in behalf of the King of Spain in the third circuit by Justice Washington and Judge Peters in 1810.
 
 †
 
 The Constitution expressly extends the judicial power to controversies between a State, or citizens thereof, and
 
 foreign States,
 
 citizens, or subjects, without reference to the subject-matter of the controversy. Our own government has largely availed itself of the like privilege to bring suits in the English courts in cases growing
 
 *168
 
 out of our late civil war. Twelve or more of such suits are enumerated in the brief of the appellees, brought within the last five years in the English law, chancery, and admiralty courts. There are numerous cases in the English reports in which suits of foreign sovereigns have been sustained, though it is held that a sovereign cannot be forced into court by suit.
 
 *
 

 The next question is, whether the suit has become abated by the recent deposition of the Emperor Napoleon. We think it has not. The reigning sovereign represents the national sovereignty, and that sovereignty is continuous and perpetual, residing in the proper successors of the sovereign for the time being. Napoleon was the owner of the Euryale, not as an individual, but as sovereign of France. This is substantially averred in the libel. Ou his deposition the sovereignty does not change, but merely the person or persons in whom it resides. The foreign state is the true and real owner of its public vessels of war. The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights. The next successor recognized by our government is competent to carry on a suit already commenced and receive the fruits of it. A deed to or treaty with a sovereign as such enures to his successors in the government of the country. If a substitution of names is necessary or proper it is a formal matter, and can be made by the court under its general power to preserve due symmetry in its forms of proceeding. No allegation has been made that any change in the
 
 *169
 
 real and substantial ownership of the Euryale has occurred by the recent devolution of the sovereign power. The vessel has always belonged and still belongs to the French nation.
 

 If a special case should arise in which it could be shown that injustice to the other party would ensue from a continuance of the proceedings after the death or deposition of a sovereign, the court, in the exercise of its discretionary power, would take such order as the exigency might require to prevent such a result.
 

 The remaining question relates to the merits of the case. And on the merits of the case, as presented by the record, we think that the court below erred in imposing the whole damage upon the Sapphire. We think that the Euryale was equally in fault, and that the damage ought to be divided between them. It is not our general practice to scrutinize very carefully the weight of evidence in cases of collision, where the evidence is substantially conflicting, and where both District and Circuit Courts have concurred in a decree upon the merits. Our views upon this subject will be found quite fully expressed by Mr. Justice Clifford in the case of
 
 The Baltimore.
 

 *
 

 But this case depends upon a narrow point, . the evidence on which is in our view so decidedly adverse to the sole liability of the Sapphire that it becomes our duty to notice it.
 

 The Euryale came to anchor in the harbor on the 14th of December, about six hundred yards from the wharf. She was of four hundred and fifty tons burden, drew thirteen feet of water, and had out fifty-six fathoms of chain, and an anchor weighing 3500 pounds. The Sapphire, of thirteen hundred tons burden, came to anchor about the 18th of December, about three hundred yards (as alleged both in the libel and answer) to the southeasterly of the Euryale, at a point farther up the harbor, and farther from the wharf. She had out about fifty fathoms of chain, and an anchor weighing 3600 to 3800 pounds, and she was heavily laden, drawing about twenty-three feet of water.
 

 
 *170
 
 Ou the night of the 2Íst of December it commenced to blow pretty strong from the southeast, by midnight blowing a six-knot breeze, and it kept increasing up to the time of the collision at five o’clock the next morning, when it seems to have been blowing a gale. At half-past three in the morning the tide changed from ebb to flood, the direction of flood-tide beiug southeasterly, directly contrary to that of the wind. And the captain of the Euryale says (and he is not contradicted) that the wind was twice as strong as the tide. The weight of the evidence is that the Sapphire, under the force of the wind, dragged her anchor and got inside of the Euryale; that is, between her' and the city. At a few minutes past five the collision occurred.
 

 The libellant insists that the Sapphire was in fault in two points: 1st, in anchoring too near the Euryale in the first instance; 2d, in not having out sufficient anchors. "We think that the first charge is not sustained. Experienced pilots testified that two hundred and fifty yards distance is a good and sufficient berth in that harbor. And it is to be noted that the master of the Euryale made no complaint of too great proximity, although she and the Sapphire wére lying in the same relative position for several days. On the other point, we agree with the .District and Circuit Courts that the Sapphire was in fault. Had á second anchor been put out at an earlier period the collision in all probability would not have occurred. Indeed, the captain of the Sapphire gave orders to the first officer that if she was likely to start, to put the second anchor down. But it was not done till the collision itself broke the ring-stopper and let it down.. A more careful watch-would have led to the discovery of the vessel’s having started, and would, have prevented the catastrophe which ensued.
 

 But we are also* satisfied that the Euryale was not free from fault. The captain was not on board. The first officer, though on board, was not on deck from eleven o’clock until after the collision. Le Noir, the third officer, was officer of the deck that night. He was called up by the head, or chief, of the watch at three o’clock to observe that the Sapphire
 
 *171
 
 was approaching nearer to them than she had been. He attributed it to her letting out more chain, and returned below, and did not come on deck again.until five o’clock, a few moments before the collision, when it was too late to avoid it. The instant he came on deck he ordered done the thing that could have saved them tad it been done earlier — the jib to be hoisted. It would have sheered the vessel off, and allowed the Sapphire to pass her. Such is the testimony of the libellant’s own witnesses. It is the judgment of the first officer of the ship. Why was not this done before? Why was not the officer, on such a night, in such a gale, at his post? At four o’clock the man in charge of the watch saw the Sapphire approaching, and says he made a report to that effect. The first officer says that no report was made to him. But the third officer, who was officer of the deck, does not say that it was not made to him. If the fact was not communicated to the proper officer, that was in itself a fault. If it was communicated and not attended to, the case of the libellant is not bettered.- But the evidence is very strong that the officer received the information. Deveaux, the head of the watch, says that he reported the fact at four o’clock; and Bioux, who had charge of the watch between four and five o’clock, says that between those hours he saw the Sapphire with the wirjd astern, and heading the current, coming towards-the Enryale; that she continued to approach gradually, and that he reported this to Mr. Le Noir between four and five o’clock. Here, then, was a clear neglect of proper precautions for an entire hour immediately preceding the collision.
 

 We cannot avoid the conviction that there was a want of proper care and vigilance on the part of the officers of the Euryale, and that this contributed to produce the collision which ensued. Both parties being in fault, the damages ought to be equally divided between them.
 

 Decree of the Circuit Court reversed, and the cause remitted to that court with directions to enter a decree
 

 In conformity with this opinion.
 

 †
 

 King of Spain v. Oliver, 2 Washington’s Circuit Court, 431.
 

 *
 

 King of Spain
 
 v.
 
 Hullett, 1 Dow & Clarke, 169; S. C., 1 Clarke & Finelly, 333; S. C., 2 Bligh, N. S. 31; Emperor of Brazil, 6 Adolphus
 
 &
 
 Ellis, 801; Queen of Portugal, 7 Clarke
 
 &
 
 Finelly, 466; King of Spain, 4 Russell, 225; Emperor of Austria, 3 De Gex, Fisher & Jones, 174; King of Greece, 6 Dowling’s Practice Cases, 12; S. C., 1 Jurist, 944; United States, Law Reports, 2 Equity Cases, 659; Ditto, Ib. 2 Chancery Appeals, 582; Duke of Brunswick
 
 v.
 
 King of Hanover, 6 Beavan, 1; S. C., 2 House of Lords Cases, 1; De Haber
 
 v.
 
 Queen of Portugal, 17 Q. B. 169; also 2 Phillimore’s International Law, part vi, chap, i; 1 Daniel’s Chancery Practice, chap, ii, § ii.
 

 *
 

 8 Wallace, 382.