**UNITED STATES ex rel. KESSLER et al.
v. WATKINS.**

**No. 279, Docket 20643.**

Circuit Court of Appeals, Second Circuit.

July 24, 1947.

Writ of Certiorari Denied Dec. 8, 1947.

See 68 S.Ct. 220.

Julius Kessler and Martha J. Kessler (S. Hazard Gillespie, Jr., of New York City, of counsel), pro se.

John F. X. McGohey, U. S. Atty., of New York City (William J. Sexton, Asst. U. S. Atty., of New York City, of counsel), for respondent-appellee W. Frank Watkins, as District Director of Immigration and Naturalization for District of New York.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an order dismissing a writ of habeas corpus with relation to the appellants Julius Kessler and Martha J. Kessler.

The writ of habeas corpus, issued December 28, 1946, was directed to W. Frank Watkins, District Director of Immigration and Naturalization for the District of New York. Under date of January 21, 1947, a return to the writ was filed on behalf of the District Director asserting that the appellants were held in custody as "alien enemies pursuant to the provisions of 50 U.S.C.A. § 21, and Proclamation of the President, No. 2526, dated December 8, 1941," and that the appellants had been ordered "removed from the United States by orders of the Attorney General, pursuant to Proclamation of the President, No. 2655, dated July 14, 1945."

The proceeding came on for hearing before Judge Hulbert who dismissed the writ on the authority of United States ex rel. Schlueter v. Watkins, 2 Cir., 158 F.2d 853, a decision which affirmed that of Judge Rifkind reported in D.C., 67 F.Supp. 556. From an order entered upon the decision of Judge Hulbert this appeal was taken.

At the request of the appellants for appointment of counsel S. Hazard Gillespie, Jr., was assigned to conduct their appeal. We have received much aid and clarification of the issues from his able brief and

admirable argument. While the relators were obliged to prosecute this appeal in forma pauperis they have had the benefit of counsel so thorough in the preparation and so excellent in presentation of their case as to deserve the sincere praise as well as thanks of the court. In spite of the fact that after careful consideration we are obliged to differ with the result the appellants seek to reach it is gratifying to realize that they have had the best legal assistance in support of their claims.

■ The appellants are German nationals residing in this country, and are held pursuant to internment orders issued by the Attorney General in 1943 and removal orders dated January 18, 1946, the latter being issued by the Attorney General under Proclamation of the President No. 2655, July 14, 1945, 10 Fed.Reg. 8947. Proclamation 2655 provides in part that: "All alien enemies now or hereafter interned within the continental limits of the United States pursuant to the aforesaid proclamations of the President of the United States who shall be deemed by the Attorney General to be dangerous to the public peace and safety of the United States because they have adhered to the aforesaid enemy governments or to the principles of government thereof shall be subject upon the order of the Attorney General to removal from the United States and may be required to depart therefrom in accordance with such regulations as he may prescribe."

The authority upon which the Proclamation is based is contained in 50 U.S.C.A. § 21, and the constitutionality of the statute as construed in the case at bar has been sustained by this court in the case of United States ex rel. Schlueter v. Watkins, 2 Cir., 158 F.2d 853. Appellants do not again raise the constitutional issue, but, while conceding that there are no essential differences between the actual situation in the present case and that in the Schlueter case, they urge us to re-examine the removal statute and to construe it as applicable only for the duration of the actual hostilities.

The appellants, Julius Kessler and Martha J. Kessler, were born in Germany, in the town of Wuppertal, not far distant from Dusseldorf. He was born in 1913; she is ten years his senior. In 1936—at the age of 23—Mr. Kessler emigrated to the United States. It was his intention to become a permanent resident of this country, as well as a United States citizen. Five months after his arrival, he declared his intention to that effect and took out his first papers. A year after Mr. Kessler's arrival, the appellant Martha J. Kessler followed him to this country and they were married. The basis for deporting them from the United States is that expressed in each order of removal by "Tom C. Clark, Attorney General"; i.e., "I deem the said alien enemy to be dangerous to the public peace and safety of the United States because he has adhered to a government with which the United States is at war or to the principle thereof."

The sole question is whether the courts have power to review the finding of the Attorney General in a case like the present; in other words, whether the basic statute [1] from which the executive authority to in-

---

[1] Section 21, 50 U.S.C.A.:
"Section 21. Restraint, regulation, and removal. Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized, in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are

tern and deport enemy aliens was derived limits the exercise of the power to a time of actual hostilities. It is conceded that the orders interning these aliens in 1943 were valid; but it is said that when active warfare ceased the statute was no longer applicable.

The contention of the appellants that the statute for the internment and removal of enemy aliens ceased to be applicable on the cessation of hostilities is contrary not only to our own decision in United States ex rel. Schlueter v. Watkins, 2 Cir., 158 F.2d 853, but to those of the Court of Appeals for the District of Columbia in Citizens Protective League v. Clark, 155 F.2d 290, 295, and of the Seventh Circuit in United States ex rel. Hack v. Clark, 159 F.2d 552. The basic statute was a very old one, derived in almost exact words from the Act of July 6, 1798. See c. 66, § 1, 1 Stat. 577. The authority given by it to the President is not limited to situations where war is declared but includes situations where "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government * * *." There is not the slightest indication in the statute that the exercise of the power is limited to times of active hostilities or that dangers from foreign nationals of an enemy were regarded as terminated until peace was declared. While President Truman in Proclamation 2714 of December 31, 1946, 50 U.S. C.A.Appendix, § 601 note, declared the cessation of hostilities in World War II was effective on that date, his proclamation recited that "a state of war still exists." Likewise in Kahn v. Anderson, 255 U.S. 1, 9, 41 S.Ct. 224, 65 L.Ed. 469, the Supreme Court when dealing with Article of War 92, 10 U.S.C.A. § 1564, which provided that " * * * no person shall be tried by court-martial for murder or rape committed within the geographical limits of the States of the Union and the District of Columbia in

time of peace," held that the term "peace" did not mean cessation of hostilities but peace in the complete sense, officially declared. See also In re Yamashita, 327 U.S. 1, 11, 12, 66 S.Ct. 340, 90 L.Ed. 499.

Appellants' counsel argues that the Congressional debates preceding the enactment of the Alien Law of 1798 by Gallatin, Otis and others, show that Congress intended that "war" as used in the Alien Enemy Act should be war in fact. We cannot agree that the discussions had such an effect. Gallatin argued that Section 9 of Art. I of the Constitution allowing to the states the free "Migration or Importation" of aliens until 1808 might stand in the way of the Act as proposed if it was not limited to a "state of actual hostilities." It however was not so limited in the text of the act and it is hard to see how the failure to limit it in words indicated a disposition on the part of Congress to limit it by implication. Otis objected to limiting the exercise of the power to a state of declared war because he thought that the President should have power to deal with enemy aliens in the case of hostilities short of war and in cases where a war was not declared. That Otis wished to add "hostilities" to the words "declared war," and failed in his attempt, does not show that Congress meant that when war was declared active hostilities must exist in order to justify the exercise of the power. The questions raised which were dealt with in the act as finally passed were not how long the power should last when properly invoked, but the conditions upon which it might be invoked. Those conditions were fully met in the present case and no question is raised by appellants' counsel as to the propriety of the President's Proclamation of War. There is no indication in the debates or in the terms of the statute that the exercise of the power, when properly invoked, should cease until peace was made, and peace has not been made in the present

found necessary in the premises and for the public safety.
  *     *     *     *     *     *

"This section is from R.S. § 4067 (derived from Act July 6, 1798, c. 66, § 1, 1 Stat. 577), as amended by Act April

16, 1918, c. 55, cited to the text.
"The amendment consisted in striking therefrom the words 'males' between the word 'being' and the words 'of the age of fourteen years and upward.'"

case. If the construction of the statute contended for by appellants' counsel were adopted, the Executive would be powerless to carry out internment or deportation which was not exercised during active war and might be obliged to leave the country unprotected from aliens dangerous either because of secrets which they possessed or because of potential inimical activities. It seems quite necessary to suppose that the President could not carry out prior to the official termination of the declared state of war, deportations which the Executive regarded as necessary for the safety of the country but which could not be carried out during active warfare because of the danger to the aliens themselves or the interference with the effective conduct of military operations.

The letter of Attorney General Gregory referred to by appellants' counsel does not affect our conclusions. When he said that there was no law to exclude aliens he was, in our opinion, plainly referring to conditions after the ratification of the peace treaty, and not to prior conditions.

Appellants' final argument that the German Government ceased to exist after unconditional surrender and that there is, therefore, no "foreign nation or government" as to which there is a declared war, cannot be sustained. As we said in Lehigh Valley R. Co. v. State of Russia, 2 Cir., 21 F.2d 396, 401, quoting from Moore's Digest of International Law, "though the government changes, the nation remains, with rights and obligations unimpaired." See also Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224; The Sapphire, 11 Wall. 164, 168, 20 L.Ed. 127. The German nation declared war on us December 8, 1941, through the Nazi Government, and that war has never been ended for the President declared in his Proclamation, which we have already cited, that "hostilities have terminated" but also that "a state of war still exists."

For the foregoing reasons the order dismissing the writs of habeas corpus is affirmed.