DRONEY, Circuit Judge,
concurring in part and dissenting in part:
In response to Iraq’s 1990 invasion of Kuwait, the United Nations Security Council implemented economic sanctions— widely characterized as the most far-reaching in history — against the regime of Saddam Hussein (the “Hussein Regime” or the “Regime”). The U.S. Congress enforced the sanctions through the Iraq Sanctions Act of 1990, which made all trade for economic gain with the Hussein Regime a criminal offense. Pub.L. No. 101-513, § 586E(2)(B), 104 Stat.1979, 2049, 50 U.S.C. § 1701, note. To “reconciled strong sanctions against a corrupt Iraqi regime with [the] need[ ] ... [to provide] food and medicines to an innocent and vulnerable population,” the U.N. Security Council then implemented — again with the U.S.’s support — the Oil-for-Food Pro-gramme (the “Programme”). The Pro-gramme permitted Iraq to sell oil on the international market on the condition that all of the proceeds were placed into a U.N. escrow account established at the New York branch of the Banque Nationale de Paris (“BNP”), to be used only for the humanitarian needs of the Iraqi people, administrative costs for the Programme, and war reparations to Kuwait.
The invasion of Iraq and overthrow of the Hussein Regime by a U.S.-led coalition of forces in the spring of 2003 revealed pervasive corruption in the Programme, described by some as the “largest financial fraud in human history.” The corruption of the Programme was documented in detail in a report of the U.N. Independent Inquiry Committee into the United Nations Oil-for-Food Programme. Based largely on this report, the defendants in this litigation — two individuals, along with numerous business entities — are alleged to have conspired with the Hussein Regime to violate the sanctions and subvert the Programme. By purchasing oil from the Regime at below-market prices or selling humanitarian supplies (often of sub-standard quality) to it at above-market prices while making side-payments to the Regime — or, in the case of the BNP defendants, facilitating such payments — the defendants allegedly diverted at least ten billion dollars intended for humanitarian aid to the Regime. The two individual defendants named here have already pled guilty to criminal charges relating to their role in corrupting the Programme, and many of the business entity defendants have entered into non-prosecution or deferred prosecution agreements with the U.S. Department of Justice in which they admit to involvement in the scheme.
The majority nevertheless concludes that the Republic of Iraq (the “Republic”) may not bring suit, through its current government, to recover funds allegedly unlawfully siphoned off from the U.N. escrow account. Because the Hussein Regime orchestrated the fraud, the majority reasons, the Republic participated in the fraud as well, and thus stands in equal fault (in pari delicto) with the defendants. I disagree. In pari delicto is an “equita *174 ble defense ... [,] rooted in the common-law notion that a plaintiffs recovery may be barred by his own wrongful conduct.” Pinter v. Dahl, 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). But the majority’s analysis does not rest on the Republic’s “own wrongful conduct.” Instead, the majority begins its analysis with a general principle of state responsibility under which “the obligations of a foreign state are unimpaired by a change in that state’s government,” Maj. Op., ante, at 164 — a principle that we have never before recognized in this context, where the conduct that the defendants are alleged to have engaged in with a foreign government was illegal under U.S. law from the beginning. The majority then concludes, based on this purported principle of state responsibility, that the post-Hussein Republic should be treated as complicit in the Regime’s fraud on a humanitarian relief program specifically designed to aid the civilian population while not enriching the Regime. The in pari delicto defense is founded on the twin premises that “courts should not lend their good offices to mediating disputes among wrongdoers ... [and] that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality.” Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). Yet here it functions to release defendants of liability for conduct that, if true, constituted a clear violation of U.S. law and subversion of U.S. policy, and to deprive the ultimate victims of the defendants’ conduct of any remedy.
I therefore concur only in the majority’s holding that the Foreign Corrupt Practices Act does not create a private right of action; otherwise, I respectfully dissent.
I.
The majority presents its decision as deriving from the long-established principle that “the legal position of a foreign state survives changes in its government.” Maj. Op., ante, at 164. In articulating this principle, the majority draws on two distinct lines of cases. The first concerns foreign sovereigns’ conduct within the U.S.: it holds that, when a foreign sovereign acts under U.S. law — such as by litigating in U.S. courts or entering into transactions — it does so through its then-recognized government and the government’s designated representatives, such as ambassadors. See, e.g., Guar. Trust Co. of N.Y. v. United States, 304 U.S. 126, 137-41, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). The second — the act of state doctrine— concerns foreign governments’ conduct within their own territory: it holds that generally “the courts of this country [will not] inquir[e] into the validity of the public acts [of] a recognized foreign sovereign power committed within its own territory.” Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Neither of these doctrines applies here.
A.
The principle that a foreign state acts under U.S. law through its recognized government has long been established. In The Sapphire, the Supreme Court held that the deposition of Emperor Napoleon III did not abate a tort suit previously brought by France to recover for damages caused to a French ship in a collision in San Francisco harbor. 78 U.S. 164, 168, 11 Wall. 164, 20 L.Ed. 127 (1870). “The reigning Emperor, or National Assembly, or other actual person or party in power, is but the agent and representative of the national sovereignty,” the Supreme Court held, such that “[a] change in such representative works no change in the national sovereignty or its rights.” Id. at 168. *175 Similarly, in Lehigh Valley Railroad Co. v. Russia, this Court held that the then-recognized representative of the provisional Russian government could bring suit to recover for the destruction of Russian-owned ammunition and explosives while in transit in the United States. 21 F.2d 396, 401 (2d Cir.1927). Although the explosion occurred in 1916, under the Imperial Russian Government, we held that “[t]he suit did not abate by the change in the form of government in Russia; the state is perpetual, and survives the form of its government.” Id. at 401. Finally, and by the same logic, in Guaranty Trust Co. of New York v. United States, the Supreme Court held that, where the prior recognized government of a foreign sovereign allowed the statute of limitations for a claim to run, the U.S.’s subsequent recognition of a new government did not revive the time-barred claim. 304 U.S. at 141, 58 S.Ct. 785. Again, because “the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it,” the change in the recognized government effected no change in the time-barred claim. Id. at 137, 58 S.Ct. 785.
The majority identifies no decisions, however, in which this principle of state “responsibility” operates — as it does here — to release a non-state defendant from liability for conduct that was illegal under U.S. law from its inception. Such a conclusion is inconsistent with the premise underlying the rule articulated in Guaranty Trust. There the Supreme Court rejected the argument that recognition of a new government of a foreign sovereign “renders of no effect transactions here with a prior recognized government in conformity to the declared policy of our own government.” Id. at 140, 58 S.Ct. 785. It rooted this conclusion both in the separation of powers and in the need to protect legitimate reliance on the finality of a recognized government’s acts. “What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government,” the Court observed. Id. at 137, 58 S.Ct. 785. “The very purpose of the recognition by our government,” the Court continued, “is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are. If those transactions, valid when entered into, were to be disregarded after the later recognition of a successor government,” the Court concluded, “recognition would be but an idle ceremony, yielding none of the advantages of established diplomatic relations in enabling business transactions to proceed, and affording no protection to our own nationals in carrying them on.” Id. at 140-41, 58 S.Ct. 785.
Here, however, the United States had no diplomatic relations with the Regime during the relevant time, and the side-agreements allegedly entered into between the defendants and the Hussein Regime were not in any sense “valid when entered into” or “in conformity [with] the declared policy of our own government.” On the contrary, the side-agreements stood in clear violation of U.S. law and violated the U.S.’s trade embargo policy towards Iraq. The rule articulated in Guaranty Trust serves to prevent courts from questioning determinations properly left to the political branches, and to protect legitimate reliance “upon the finality and legality of [a] government’s acts.” Banco de Espana v. Fed. Reserve Bank of N.Y., 114 F.2d 438, 444 (2d Cir.1940). But the political branches prohibited transactions with the Hussein Regime, except those that took place through the Programme. The defendants here could have no legitimate ex *176 pectations in the “finality” or “legality” of a side-agreement with the Hussein Regime. Indeed, attempting to enforce one .of these alleged agreements in a U.S. court would likely entail admitting to a felony. Under these circumstances, the rule articulated in Guaranty Trust has no application.
B.
The majority further asserts that the actions of the Hussein Regime are properly attributed to the Republic because the Regime “acted as the government of Iraq.” Maj. Op., ante, at 165. This conclusion again relies on a principle that does not apply to this case. The decisions that the majority cites in support of this assertion primarily involve the act of state doctrine, which, in its traditional formulation, holds that “the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory.” Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). The court below, however, found that the act of state doctrine did not preclude the Republic’s claims, Republic of Iraq v. ABB AG, 920 F.Supp.2d 517, 533-34 (S.D.N.Y.2013), and the majority does not reject this conclusion.
The district court was correct in its determination that the act of state doctrine does not preclude the Republic’s claims. Adjudicating Iraq’s claim would not require a court to “inquir[e] into the validity of the public acts a recognized foreign sovereign power committed within its own territory.” Banco Nacional de Cuba, 376 U.S. at 401, 84 S.Ct. 923. In W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., International, an unsuccessful bidder for a contract with the Nigerian government sued a successful bidder, contending that the successful bidder violated RICO, the Robinson-Patman Act, and New Jersey state anti-racketeering laws in procuring the contract by paying bribes to Nigerian officials. 493 U.S. 400, 402, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). The successful bidder argued that the act of state doctrine precluded the litigation, since the facts necessary to establish that the bribery occurred would also “support a finding that the contract [was] invalid under Nigerian law.” Id. at 406, 110 S.Ct. 701. The Supreme Court rejected this argument. Id. “Act of state issues only arise when a court must decide — that is, when the outcome of the case turns upon— the effect of official action by a foreign sovereign,” the Court found. Id. (emphasis in original). “When that question is not in the case, neither is the act of state doctrine.” Id.
Here, similarly, although a finding against the defendants would tend to imply that the Hussein Regime violated its international obligations by corrupting the Pro-gramme (a conclusion that, in any event, seems beyond dispute), no aspect of the Republic’s claims turns on the validity of the Hussein Regime’s conduct. The Republic’s complaint challenges the conduct of non-state defendants under U.S. law.[1] *177 Indeed, if adjudicating the Republic’s claims against the defendants required an inquiry into the validity of the Hussein Regime’s official acts, then the criminal convictions of the two individual defendants and the non-prosecution agreements entered into between the Department of Justice and various corporate defendants would stand on faulty premises: a U.S. court could never adjudicate such charges without violating the act of state doctrine.
Furthermore, the Republic’s claims do not implicate acts by the Hussein Regime performed solely on Iraqi territory. See Underhill, 168 U.S. at 252, 18 S.Ct. 83; Banco de Espana, 114 F.2d at 443 (“It has been squarely held that the courts of this country will not examine the acts of a foreign sovereign within its own borders, in order to determine whether or not those acts were legal under the municipal law of the foreign state.” (emphasis added)); see also Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246, 249 (2d Cir.1947) (barring, under the act of state doctrine, U.S. court from hearing claim based on conversion of property committed in Germany by German officials). Instead, the Republic contends that the defendants — individuals and corporations located outside of Iraq — conspired with the Hussein Regime to subvert an international humanitarian relief program, run out of the U.N. headquarters in New York, in ways that diverted money that would otherwise have been placed in an escrow account established at a bank branch in New York. Indeed, the requirement that all transactions be approved by the U.N. and pass through an escrow account outside of Iraqi control was plainly crucial to the functioning Programme, since it was designed to ensure that the proceeds of oil sales were not diverted from humanitarian uses. Because “[a]ets of foreign governments purporting to have extraterritorial effect ... by definition[ ] fall[ ] outside the scope of the act of state doctrine,” the conduct of the Hussein Regime in subverting the Programme cannot be encompassed by the doctrine. Allied Bank Int’l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 522 (2d Cir.1985).
Even if the act of state doctrine were implicated in this case, that would not end the analysis. Once a court determines the doctrine’s “technical availability,” it then considers whether “the policies underlying the act of state doctrine” indicate that it “should nonetheless not be invoked.” W.S. Kirkpatrick & Co., 493 U.S. at 409, 110 S.Ct. 701. Key among these considerations is whether “the government that committed the challenged act of state is no longer in existence.” Id. (internal quotation marks omitted). Even in cases that— unlike this case — do require a U.S. court to assess the validity of a foreign government’s acts within its own territory, therefore, we do not apply an inflexible rule that imputes the conduct of a former government to a current government. Because the act of state doctrine protects against litigation that would “embarrass or hinder the executive in the realm of foreign relations,” it would contravene the doctrine’s purpose to prevent the current government of a foreign state from repudiating the conduct of a prior government on the foreign state’s territory. Bigio v. Coca-Cola Co., 239 F.3d 440, 452 (2d Cir.2000). *178 In Bigio v. Coca-Cola Co., for instance, we found that the act of state doctrine did not bar plaintiffs’ action to recover property that a former Egyptian government had confiscated because the plaintiffs’ were Jewish. 239 F.3d at 453. We noted that the Nasser regime, which effected the property seizure, was “long gone,” and that “the current government ... has apparently repudiated the acts in question and has sought to have the property or its proceeds returned to the [plaintiffs].” Id. Here, not only is the regime that committed the wrongdoing no longer in existence, but its successor government is itself the plaintiff in this matter. Indeed, a conclusion that the Republic is barred from seeking redress against these defendants in the U.S. courts — even as the U.S. government itself extracts fines from many of the same defendants for the same conduct — arguably poses a greater risk of “interfering] with the relationship between [the Republic of Iraq] and the United States” than allowing the litigation to proceed. Id.
Because the Republic’s claims do not require that the court assess the validity of the Iraqi government’s acts on Iraqi territory, the act of state doctrine does not apply to this case. And because the act of state doctrine does not apply, the fact that “the Hussein Regime’s effort to subvert the Programme was the policy of the Iraqi government” does not preclude the Republic’s claims. Maj. Op., ante, at 165. Indeed, the majority’s reliance on act of state case law leads to the paradoxical conclusion that defendants are insulated from liability to the Republic for their conduct precisely because they did not merely aid a single corrupt Iraqi official in embezzling funds for personal benefit, but instead conspired with an entire authoritarian regime in a concerted scheme to violate U.S. law and subvert U.S. foreign policy. In concluding that the alleged conspiracy pursued a “public goal,” the majority notes that the Hussein Regime regarded the corruption of the Oil-for-Food Programme as crucial to undermining the sanctions and remaining in power. Maj. Op., ante, at 165-66. But it was the public goal of our government to weaken the Hussein Regime through economic sanctions while minimizing, through the Oil-for-Food Pro-gramme, the suffering of the Iraqi civilian population. I see no basis in our law for treating the defendants’ conduct differently simply because they conspired with a foreign government to achieve a “public goal” that was directly at odds with U.S. policy.
II.
The absence of a rule that treats the Republic as complicit in the Regime’s wrongdoing and the deleterious impact of the defendants’ alleged actions on U.S. policy have special salience here. The doctrinal mechanism through which Iraq’s purported “participation” in the Regime’s conduct operates to bar the Republic’s claims — in pari delicto — has been recognized under federal law only in its traditional formulation, in which it “was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury.” Bateman Eichler, 472 U.S. at 307, 105 S.Ct. 2622. The Supreme Court has emphasized, moreover, that “public policy implications [must] be carefully considered before the defense is allowed” to “ensure[] that the broad judge-made law does not undermine the congressional policy favoring private suits as an important mode of enforcing federal [ ] statutes.” Pinter, 486 U.S. at 633, 108 S.Ct. 2063 (internal citation omitted). Under federal law, therefore, the in pari delicto defense is allowed “only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the *179 violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the ... laws.” Id. at 310-11, 108 S.Ct. 2063. The defendants here satisfy neither of these two prongs.
To satisfy the first prong, the defendant must establish that the plaintiff was an “an active, voluntary participant in the unlawful activity that is subject of the suit.” Pinter, 486 U.S. at 636, 108 S.Ct. 2063. This requirement reflects the in pari delicto doctrine’s equitable origins in the idea that a party that has morally tainted itself in a matter cannot invoke the court’s equitable powers. For instance, Judge Learned Hand wrote for this Court that the closely related “unclean hands” defense is “derived from the unwillingness of a court ... to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.” Art Metal Works, Inc. v. Abraham & Straus, 70 F.2d 641, 646 (2d Cir.1934) (Hand, J., dissenting), original decree vacated and dissent adopted as opinion of the court on reh’g, 107 F.2d 944 (2d Cir.1939) (per curiam). Accordingly, for “immoral conduct to be relevant,” it “must touch and taint the plaintiff personally”; actions that are “imputed to [the plaintiff] legally[] do not impugn his conscience vicariously.” Id.
The Republic’s supposed participation in the fraud derives, in the majority’s analysis, from the principle that “the obligations of a foreign state are unimpaired by a change in that state’s government.” Maj. Op., ante, at 164. But, like the unclean hands defense, in pari delicto “has nothing to do with the rights or liabilities of the parties.” Art Metal Works, 70 F.2d at 646 (Hand, J., dissenting). Even if the principle of state responsibility that the majority identifies had any applicability under the circumstances of this case — where the agreements that the foreign government allegedly entered into were illegal under U.S. law from the very beginning — it does not establish the direct responsibility demanded by the first prong of the in pari delicto defense.
To apply the defense in the absence of direct conduct is especially inappropriate here, where the “agent” is an authoritarian regime and the “principal” — to which the agent’s “sins” are imputed — is the state that the regime tyrannized. The majority does not cite to — nor do I know of — any decisions where the in pari delicto defense has been applied against a foreign sovereign based on its prior government’s conduct, much less under the extraordinary circumstances as issue here, where the wrongful conduct imputed to the foreign sovereign involved the subversion of a humanitarian relief program designed to benefit the people of the foreign sovereign. Courts have, however, long rejected efforts to invoke equitable defenses against the U.S. government and its agencies, concluding that such defenses may not be “applied to frustrate the purpose of [the United States’] laws or to thwart public policy.” Pan-Am. Petroleum & Transp. Co. v. United States, 273 U.S. 456, 506, 47 S.Ct. 416, 71 L.Ed. 734 (1927); see, e.g., United States v. Philip Morris, Inc., 300 F.Supp.2d 61, 75-76 (D.D.C.2004).
The majority cites to New York case law holding that the wrongdoing of corporate managers and agents may be imputed to the corporation in the application of the in pari delicto defense. See Maj. Op. at 166-67 (discussing Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466-67, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010)). But even in that context courts are not uniform in their views. In deciding whether to give effect to the in pari delicto doctrine, other states have “draw[n] a sharp distinction between those who deal in good faith with the *180 principal-corporation ... and those who do not,” concluding that “the ordinary rationale supporting imputation breaks down completely in scenarios involving secretive, collusive conduct between corporate agents and third parties,” such as where an auditor conspires with corporate management to defraud a corporation. Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found, v. PriceWaterhouseCoopers, LLP, 605 Pa. 269, 305-06, 989 A.2d 313 (2010). “[B]ecause imputation rules justly operate to protect third parties on account of their reliance on an agent’s actual or apparent authority,” these courts reason, “such principles do not (and should not) apply ... where both the agent and the third party know very well that the agent’s conduct goes unsanctioned by one or more of the tiers of corporate governance.” Id. at 307, 989 A.2d 313; see also NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 371, 901 A.2d 871 (2006) (“[T]he imputation defense exists to protect innocent third parties from being sued by corporations whose agents have engaged in malfeasant behavior against those third parties.” (emphasis added)). The same logic applies here, where the defendants allegedly engaged in secretive, collusive conduct with the Hussein Regime, while knowing full well that their conduct was illegal under U.S. law.
The relationship between a corporation and its officers also differs in several obvious respects from the relationship between a sovereign state and its government— particularly where that government is an authoritarian regime — rendering the policy justifications that might support imputation in the former context altogether inapplicable in the latter. The New York Court of Appeals has justified imputing the acts of corporate officers to the corporation itself by observing that “imputation fosters an incentive for a principal to select honest agents and delegate duties with care.” Kirschner, 15 N.Y.3d at 466, 912 N.Y.S.2d 508, 938 N.E.2d 941. But Saddam Hussein seized power in a military coup; his regime maintained its control over the Iraqi state through “extensive, systematic, and continuing human rights abuses ..., including summary executions, mass political killings, disappearances, widespread use of torture, arbitrary arrest and prolonged detention without trial of thousands of political opponents, forced relocation and deportation, denial of nearly all civil and political rights such as freedom of association, assembly, speech, and the press, and the imprisonment, torture, and execution of children.” § 586F(a)(4), 164 Stat. at 250. Allowing the in pari delicto defense under these circumstances excises the doctrine’s requirement that the plaintiff be an “an active, voluntary participant in the unlawful activity that is subject of the suit,” Pinter, 486 U.S. at 636, 108 S.Ct. 2063 — transforming a defense founded “upon the court’s repugnance to the suitor personally,” Art Metal Works, 70 F.2d at 646 (Hand, J. dissenting), into a rule of derivative guilt.
Insulating the defendants from liability to the Republic for their alleged wrongdoing is, moreover, contrary to public policy, the second prong of the in pari delicto test. RICO’s express private right of action is designed to aid “in eradicating organized crime from the social fabric” by “divest[ing] the [defendant] of the fruits of its ill-gotten gains.” United States v. Turkette, 452 U.S. 576, 585, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This goal is especially important when the alleged conspiracy undermined a trade embargo established— with the support of both political branches — in response to “an unusual and extraordinary threat to the national security and foreign policy of the United States,” Exec. Order No. 12,722, 55 Fed.Reg. 31,- *181 803 (Aug. 2, 1990); § 586C, 104 Stat. at 2048, and corrupted a humanitarian relief program designed to alleviate the “near apocalyptic results” that the embargo and the Hussein Regime’s ongoing brutality had on the Iraqi people. The in pari delicto defense is “based not on solicitude for the defendant, but on concern for the public welfare, and thus when application of the doctrine would not be in the public interest, the courts will permit recovery.” In re Leasing Consultants Inc., 592 F.2d 103, 110 (2d Cir.1979). Accordingly, I do not believe that we should allow the defense where it leads to results so clearly at odds with U.S. public policy.
Indeed, the application of the in pari delicto defense in this case leads to a result that directly contradicts U.S. policy towards Iraq throughout the relevant time. U.S. policy towards Iraq did not treat the Iraqi state as collectively complicit in the Hussein Regime’s conduct. From the beginning, the economic sanctions recognized an exception for “donations of articles intended to relieve human suffering, such as food, clothing, medicine and medical supplies intended strictly for medical purposes.” Exec. Order No. 12,722 § 2(b); see also § 586C(b), 104 Stat. at 2048; Exec. Order No. 12,724 § 2(b), 55 Fed. Reg. 33,089 (Aug. 9, 1990); S.C. Res. 661, para. 4, U.N. Doc. S/RES/661 (Aug. 6, 1990) (recognizing exception for “payments exclusively for strictly medical or humanitarian purposes”). The core premise of the Oil-for-Food Programme was that the Hussein Regime should be permitted to sell its oil on the international market, provided “that all States ... take any steps that may be necessary ... to ensure that the proceeds of the sale [were] not diverted from” the authorized purposes. S.C. Res. 986, paras. 8, 14, U.N. Doc. S/RES/986 (Apr. 14, 1995). Far from treating the entire state as complicit in the Regime’s conduct, in 1998, in the midst of the trade embargo, the U.S. Congress approved the appropriation of five million dollars to support “Iraqi democratic opposition” through “such activities as organization, training, communication and dissemination of information, developing and implementing agreements among opposition groups, [and] compiling information to support the indictment of Iraqi officials for war crimes----” 1998 Supplemental Appropriations and Rescission Act, Pub.L. No. 105-174, § 10008, 112 Stat. 58, 101.
The majority’s discussion of the second prong of the in pari delicto defense concludes in general terms that “it is consistent with the purpose of RICO to recognize an in pari delicto defense in cases where, as a direct result of the plaintiffs affirmative wrongdoing, the plaintiff bears at least substantially equal responsibility for the RICO violations of which it complains.” Maj. Op., ante, at 168 (internal citations and quotation marks omitted). Other circuits that have recognized the in pari delicto defense in the RICO context, however, did so in circumstances where allowing the plaintiff to recover “under RICO would not divest RICO violators of their ill-gotten gains; it would result in a wealth transfer among similarly situated conspirators.” Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1155 (11th Cir.2006); see also Rogers v. McDorman, 521 F.3d 381, 391 (5th Cir.2008) (recognizing in pari delicto defense to RICO claims where the “scheme could not work without [the plaintiffs’] active participation,” and observing that “[t]his is not a situation where an innocent or passive victim is being deprived of a RICO remedy”). Here, by contrast, allowing the Republic to recover under RICO from the individuals and corporations that allegedly conspired to subvert the Programme would divest RICO violators of their illegal profits, and would *182 allow compensation for the ultimate victims of the defendants’ alleged fraud.
The application of the in pari delicto defense demands that courts carefully scrutinize the specific plaintiffs alleged conduct in relation to the relevant public policy. In Perma Life Mufflers, Inc. v. International Parts Corp., for instance, the Supreme Court addressed the question of whether Midas Muffler franchisees who knew about allegedly anti-competitive clauses in their franchise agreements could later bring an antitrust claim. 392 U.S. 134, 140, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Observing that “the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws,” the Court declined to bar antitrust plaintiffs’ claims, concluding that, in light of the economic power of the franchisor, the franchisees’ “participation was not voluntary in any meaningful sense.” Id. at 139-40, 88 S.Ct. 1981. In Bateman Eichler, Hill Richards, Inc. v. Berner, the Supreme Court again declined to apply the in pari delicto defense, this time in the context of a securities action brought by investors who made trades on the basis of “inside information” that turned out to be false. 472 U.S. at 301-02, 317, 105 S.Ct. 2622. Noting the important role that private actions play in the securities enforcement system, the Court rejected the suggestion “that an investor who engages in [insider] trading is necessarily as blameworthy as a corporate insider or broker-dealer who discloses the information for personal gain,” concluding that such a finding would ignore “important distinctions between the relative culpabilities of tippers, securities professionals, and tippees.” Id. at 312-13, 105 S.Ct. 2622. Finally, in Pinter v. Dahl — another securities action, this time involving claims based on the unlawful sale of unregistered securities — the Supreme Court rejected the suggestion that “a purchaser’s knowledge that the securities are unregistered can[ ], by itself, constitute equal culpability, even where the investor is a sophisticated buyer who may not necessarily need the protection of the Securities Act.” 486 U.S. at 636, 108 S.Ct. 2063. “Because the [Securities] Act is specifically designed to protect investors,” the Court reasoned, “even where a plaintiff actively participates in the distribution of unregistered securities, his suit should not be barred” except where his role was “more as a promoter than as an investor.” Id. at 638-39, 108 S.Ct. 2063.
Aside from demonstrating how narrowly the in pari delicto defense is circumscribed in light of public policy considerations, these decisions reflect the specificity with which the Supreme Court determines the defense’s availability. The question answered in these decisions is not simply whether the in pari delicto defense operates in the context of an antitrust or securities claim. Rather, the question is whether the Court should recognize a “broad rule of caveat tippee,” Bateman Eichler, 472 U.S. at 315, 105 S.Ct. 2622, or whether the in pari delicto defense bars a claim by “a plaintiff [who] actively participates in the distribution of unregistered securities” but whose “promotional efforts are incidental to his role as an investor,” Pinter, 486 U.S. at 638-39, 108 S.Ct. 2063.
Even if the in pari delicto defense may properly be applied to bar a plaintiffs RICO claims in some circumstances, therefore, I do not believe that it should here. The U.S. public policy behind the economic sanctions against Iraq and the Programme was critically important to our national interests. There are, moreover, “important distinctions between the relative cul *183 pabilities” of the defendants, which allegedly participated in the fraud of their own choosing and for vast profits, and the Republic, whose “responsibility” for a scheme that deprived its own civilian population of desperately needed humanitarian relief is entirely derivative of an authoritarian regime that has now been overthrown. Bateman Eichler, 472 U.S. at 312-13, 105 S.Ct. 2622.
Courts should proceed cautiously in cases that implicate foreign relations, cognizant that the “courts[’] ... powers to further the national interest in foreign affairs are necessarily circumscribed as compared with those of the political branches.” Banco Nacional de Cuba, 376 U.S. at 412, 84 S.Ct. 923. But allowing the Republic’s claims to proceed in this case would not cross the guideposts that have long operated to ensure that the courts do not encroach on areas properly reserved for the political branches. Allowing the Republic’s claims to proceed would not violate the doctrine that U.S. nationals may safely carry on business transactions with the recognized government of a foreign state, confident that the validity of such agreements will not be called into question based on the legitimacy of the government or its subsequent overthrow. See Guar. Trust Co. of N.Y, 304 U.S. at 137, 58 S.Ct. 785. Nor would allowing the Republic’s claims to proceed in any way conflict with the act of state doctrine, since adjudicating the case would not “require[] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.” W.S. Kirkpatrick & Co., 493 U.S. at 405, 110 S.Ct. 701.
But I see no reason to embrace a novel application of the in pari delicto defense to immunize the defendants from liability for conduct that was illegal under U.S. law from the very beginning and that undermined an important U.S. policy. The Supreme Court has cautioned against “expanding judicial incapacities” to hearing cases simply because they have an international dimension, observing that “[c]ourts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them.” Id. at 409, 110 S.Ct. 701. The plaintiff here alleges that it was the victim of a fraud. The vast scale of the alleged fraud does not render the Republic’s allegations any less proper for judicial resolution, and I believe it is more consistent with principles of equity to hold the defendants accountable for their own role than to impute to the plaintiff the wrongdoing of its former authoritarian regime.

. That the Republic’s claims are based on domestic law, and are asserted against non-state defendants, also explains the inapplicability of the rule that "[a] state is responsible for any violation of its obligations under international law resulting from action or inaction by [] the government of the state.” Restatement (Third) of Foreign Relations Law of the United States § 207 (1987). The district court cited this rule in support of its conclusion that the Hussein Regime's conduct redounds to the Republic, see Republic of Iraq, 920 F.Supp.2d at 536, but the majority does not appear to rely on it. The majority is correct not to base its decision on this rule. The rule governs state responsibility for violations of "obligations under international law”; it is a rule of international law. As the *177 Third Restatement observes, "[t]he principal persons under international law are states,” and it is primarily states that "have legal personality and rights and duties under international law.” Restatement (Third) of Foreign Relations Law of the United States pt. II, intro, note (1987). I see no basis for applying a principle of state responsibility under international law to immunize non-state defendants from liability for conduct under domestic law.